**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ENGINE MANUFACTURERS
ASSOCIATION,
　　　　　　*Plaintiff-Appellant,*

　　　　　　v.

SOUTH COAST AIR QUALITY
MAINTENANCE DISTRICT,
(SCAQMD); WILLIAM A. BURKE,
SCAQMD Board Chairman;
NORMA J. GLOVER, SCAQMD
Vice-Chairman; MICHAEL D.
ANTONOVICH, SCAQMD Board
Member; HAL BERNSON, SCAQMD
Board Member; JANE W. CARNEY,
SCAQMD Board Member;
CYNTHIA P. COAD, SCAQMD
Board Member; BEATRICE J.S.
LAPISTOKIRTLEY, SCAQMD Board
Member; RONALD O. LOVERIDGE,
SCAQMD Board Member; JON D.
MIKELS, SCAQMD Board
Member; LEONARD PAULITZ,
SCAQMD Board Member;
CYNTHIA VERDUGO-PERALTA,
SCAQMD Board Member; S. ROY
WILSON, SCAQMD Board
Member; BARRY R. WALLERSTEIN,
SCAQMD Executive Officer;
　　　　　　*Defendants-Appellees,*

No. 05-56654

D.C. No.
CV-00-09065-FMC

OPINION

10125

NATURAL RESOURCES DEFENSE
COUNCIL; COALITION FOR CLEAN
AIR, INC.; COMMUNITIES FOR A
BETTER ENVIRONMENT;
PLANNING AND CONSERVATION
LEAGUE; SIERRA CLUB,
            *Defendants-Intervenors-*
                    *Appellees,*

            v.

WESTERN STATES PETROLEUM
ASSOCIATION,
            *Plaintiff-Intervenor-*
                    *Appellant.*

Appeal from the United States District Court
for the Central District of California
Florence Marie Cooper, District Judge, Presiding

Argued and Submitted
July 10, 2007—Pasadena, California

Filed August 20, 2007

Before: Barry G. Silverman, William A. Fletcher, and
Richard R. Clifton, Circuit Judges.

Opinion by Judge William A. Fletcher

**COUNSEL**

Timothy A. French, Neal, Gerber and Eisenberg, Chicago, Illinois, for the appellant.

Fran M. Layton, Shute, Mihaly and Weinberger, San Farncisco, California; Kurt R. Wiese, SCAQMD, Diamond Bar, California; Daniel P. Selmi, Los Angeles, California, for the appellees.

Julie Masters, Melissa L. Perrella, NRDC, Santa Monica, California, for the defendant-intervenors-appellees.

Michael R. Barr, Kevin M. Fong, Pillsbury Winthrop, San Francisco, California; Mark E. Elliott, Pillsbury Madison, et al., Los Angeles, California, for the plaintiff-intervenor-appellant.

Kipp A. Coddington, Alston & Bird, Washington, D.C.; Timothey J. Dowling, Community Rights Counsel, Washington, D.C.; Susan L. Durbin, Office of California Attorney General, Sacramento, California, for the amici curiae.

---

**OPINION**

W. FLETCHER, Circuit Judge:

Defendant-appellee South Coast Air Quality Management District ("the District") is a political subdivision of the State of California responsible for air pollution control in the South Coast Air Basin ("the Basin"), an area comprising the City of Los Angeles and portions of surrounding counties. In 2000, the District enacted six "Fleet Rules" that require operators of various kinds of vehicle fleets — such as street sweepers, garbage trucks, and airport shuttles — to choose vehicles meeting specified emissions standards or containing specified

alternative-fuel engines when adding to their fleets. Some provisions of the Fleet Rules apply to state and local governmental agencies; others apply to federal governmental agencies and to private fleet operators. After a remand by the Supreme Court, we consider for the second time whether these Fleet Rules are preempted by the federal Clean Air Act ("CAA"), 42 U.S.C. §§ 7401 *et seq*.

We have jurisdiction under 28 U.S.C. § 1291. We review de novo the district court's grant of summary judgment, including its preemption analysis. *See Chamber of Commerce v. Lockyer*, 463 F.3d 1076, 1082 (9th Cir. 2006) (en banc). We affirm the district court in part, reverse in part, and remand for further proceedings.

## I.  Background

The Basin is the only area in the United States classified by the Environmental Protection Agency as an extreme nonattainment area for ozone. It is one of only five areas designated as a serious non-attainment area for small particulate matter. *See* 42 U.S.C. §§ 7511(a), 7513(b).

The District is charged with developing and implementing strategies to meet air quality standards within the Basin. *See* Cal. Health & Safety Code §§ 40404, 40412, 40440. California Health and Safety Code § 40447.5, adopted in 1987, authorizes the District to adopt regulations that

> [r]equire operators of public and commercial fleet vehicles, consisting of 15 or more vehicles under a single owner or lessee and operating substantially in the south coast district, when adding vehicles to or replacing vehicles in an existing fleet or purchasing vehicles to form a new fleet, to purchase vehicles which are capable of operating on methanol or other equivalently clean burning alternative fuel and to require that these vehicles be operated, to the maxi-

mum extent feasible, on the alternative fuel when operating in the south coast district.

*Id.* § 40447.5(a).

Between June and October 2000, the District adopted six rules (the "Fleet Rules" or "Rules") pursuant to § 40447.5. Each Rule applies only to fleet operators of 15 or more vehicles. The Rules variously refer to "purchasing," "procuring," "leasing," and "contracting for" vehicles and appear to use the terms "purchasing" and "procuring" interchangeably. In order to be as clear as possible in our holding, and at the risk of awkward repetition, we adhere to the Rules' terminology throughout this opinion.

Fleet Rule 1186.1 applies to fleet operators of street sweepers "when purchasing or leasing these vehicles for sweeping operations undertaken by or for governments or governmental agencies in the jurisdiction of [the District]."] The Rule applies to (1) "any federal, state, county, city or governmental department or agency, [and] any special district such as water, air, sanitation, transit, and school districts" (hereinafter, "public fleets"); and (2) any "private individual firm, association, franchise, contractor, user or owner who provides sweeping services to a governmental agency" (hereinafter, "private fleets with public contracts"). When purchasing or leasing street sweepers, these fleet operators must "acquire alternative-fuel or otherwise less-polluting sweepers." An "alternative-fuel sweeper" is one with "engine(s) that use compressed or liquefied natural gas, liquefied petroleum gas (propane), methanol, electricity, or fuel cells," and "[h]ybrid-electric and dual-fuel technologies that use diesel fuel are not considered alternative-fuel technologies for the purposes of [the] rule." Fleet operators may obtain a waiver from the Rule's requirement if they "demonstrate the technical infeasibility of complying" either because no such sweepers are commercially available, or because a fueling station for alternative-fuel sweepers is "not available within five miles of

the vehicle storage or maintenance yards." Rule 1186.1 also requires government agencies that contract for sweeping services to contract for sweeping services that use alternative-fuel sweepers if possible.

Fleet Rule 1191 applies to public fleets located in the Basin. It "requires passenger car, light-duty truck, or medium-duty vehicle fleet operators to acquire low-emitting gasoline or alternative-fuel vehicles . . . when procuring or leasing these vehicles in the District." The Rule defines compliant vehicles by reference to emissions standards for low-emission vehicles set by the California Air Resources Board ("CARB") pursuant to California's preemption waivers under § 209(b) of the Clean Air Act (discussed in greater detail below). The Rule contains various exemptions, including an exemption for emergency vehicles. The Rule also allows the public fleets to continue to purchase gasoline- or diesel-fueled vehicles by "offsetting" those purchases with purchases of low emission vehicles. The Rule does not apply to "[p]rivately owned or operated light- or medium-duty fleets that provide contract services to [a] public agency."

Fleet Rule 1192 applies to fleets of "public transit vehicle[s] or urban buses, operated by government agencies or operated by private entities under contract to government agencies." When procuring or leasing vehicles, these fleet operators must choose "alternative-fuel heavy-duty vehicles," defined as vehicles "that use[ ] compressed or liquified natural gas, propane, methanol, electricity, fuel cells, or other advanced technologies that do not rely on diesel fuel," and that meet the emissions requirements of the Urban Transit Bus Rule adopted by CARB. The Rule contains various exemptions, including for buses "not used for the express purpose of public transportation" and for buses "used for the express[ ] purpose of providing long-distance service (out-of-District)."

Fleet Rule 1193 applies to both public and private fleets of garbage trucks, regardless of whether the private fleets are

under public contract. The Rule requires the "fleet operators to acquire alternative-fuel refuse collection heavy-duty vehicles when procuring or leasing these vehicles" and defines "alternative-fuel heavy-duty vehicles" in the same manner as in Rule 1192. The Rule allows purchases of "dual-fuel" vehicles relying on both diesel and alternative fuels for certain purposes, and operators are exempt from the Rule, *inter alia*, when no alternative-fuel engine "is available commercially or could be used."

Fleet Rule 1194 applies to public and private airport transportation fleets, also regardless of whether the private fleets are under public contract. The affected vehicles include taxis, limousines, commercial shuttles, and "courtesy shuttle transportation such as those provided by . . . rental agencies and hotels." When procuring, purchasing, or leasing vehicles, fleet operators using passenger cars or medium-duty vehicles for airport transportation must acquire a specified percentage of vehicles that meet CARB's standards for low-emission vehicles. Fleet operators purchasing and leasing heavy-duty vehicles must acquire alternative-fuel vehicles, defined as vehicles "not powered by gasoline or diesel fuel." The Rule also contains various exceptions, including exemptions where no such vehicles are available or could be used and for taxi fleets if "[the District] . . . has not provided sufficient funding to fully offset the purchase cost . . . less $10,000 (paid by . . . the airport fleet operator)."

Fleet Rule 1196 requires public fleet operators of heavy-duty vehicles to acquire mostly alternative-fuel or dual-fuel vehicles when procuring, purchasing, or leasing heavy-duty vehicles. "Alternative-fuel vehicle" is defined in the same manner as in Rules 1186.1, 1192, and 1193. A "dual-fuel" vehicle is defined as a vehicle "equipped with a diesel engine that uses an alternative fuel (such as compressed or liquefied natural gas, liquefied petroleum gas, methanol, or other advanced technologies) in combination with diesel fuel to enable compression ignition." Among other exceptions, the

Rule does not apply to emergency and rescue vehicles, private fleets with public contracts, and "[m]ilitary vehicles used for tactical operations." In addition, every fleet operator may have as part of the fleet a certain number of "dedicated heavy-duty gasoline vehicles" not meeting these standards depending on the size of the fleet.

Each rule provides that a fleet operator must produce records proving compliance with the Rules upon request from the District. Each rule also contains a severability provision stating that if any part of the rule is held invalid in a court order, that order shall not affect the validity of the remainder of the Rule.

Soon after the adoption of the Fleet Rules in 2000, the Engine Manufacturers Association ("EMA") brought suit in federal district court seeking declaratory and injunctive relief from the Rules. EMA's First Amended Complaint claimed that the Rules were state emissions standards entirely preempted by § 209(a) and § 177 of the Clean Air Act. *See* CAA § 209(a), 42 U.S.C. § 7543(a) ("No State or any political subdivision thereof shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines subject to this part."); CAA § 209(b), *id*. § 7543(b) (providing an exception to preemption under § 209(a) whereby the State of California can obtain a preemption waiver from the EPA to promulgate its own emissions standards); CAA § 177, *id*. § 7507 (providing that other states may adopt the standards promulgated by California pursuant to § 209(b), but that the other states' standards must be "identical" to California's).

EMA named as defendants the District, its board members, and its executive director. The Western States Petroleum Association intervened as a plaintiff (hereinafter, together with EMA, "Appellants"). Various environmental organizations intervened as defendants: Coalition for Clean Air, Inc.; Natural Resources Defense Council, Inc.; Communities for a

Better Environment, Inc.; Planning and Conservation League; and Sierra Club (hereinafter included by reference to "the District").

The district court granted summary judgment to the District. 158 F. Supp. 2d 1107 (C.D. Cal. 2001). The court held that the Rules were not preempted by § 209(a) and § 177 because they did not compel manufacturers to meet new emissions standards; rather, they merely compelled fleet operators to purchase vehicles from within classes of vehicles conforming to extant California standards lawfully promulgated pursuant to EPA-granted waivers of § 209(a) preemption under § 209(b). Id. at 1117 ("The Fleet Rules accept as given the existing CARB vehicle standards; they merely require fleet operators to choose from among the least polluting of CARB-certified, available vehicles."); *id*. at 1119-20. This court affirmed in a published order adopting the district court's reasoning. 309 F.3d 550, 551 (9th Cir. 2002).

The Supreme Court reversed. It rejected the argument that the Rules "escape[d] pre-emption under § 209(a) . . . because they address the purchase of vehicles, rather than their manufacture or sale." 541 U.S. 246, 249 (2004). The Court held that "standard-enforcement efforts that are proscribed by § 209 can be directed to manufacturers or purchasers." *Id*. at 253. However, the Court did not decide whether the Rules were actually preempted. *See id*. at 258. The Court stated that it was "likely that at least certain aspects of the Fleet Rules are pre-empted," but allowed that "[i]t does not necessarily follow . . . that the Fleet Rules are pre-empted *in toto*." *Id.* The Court therefore remanded for further proceedings consistent with its opinion.

On remand in the district court, Appellants brought a "Motion for Order Implementing the Supreme Court's Decision" requesting declaratory and injunctive relief on the ground that the Rules were preempted in their entirety. On May 6, 2005, the district court denied Appellants' motion. The court held

that Appellants had brought an unsuccessful facial challenge because they had not carried their burden of showing that all applications of the Fleet Rules were preempted. Specifically, the court held that the Fleet Rules were not preempted as applied to state and local governmental entities. According to the court, those applications of the Rules directed state proprietary action and were therefore protected from Clean Air Act preemption under the market participant doctrine. Because the facial challenge failed, the district court declined to address the validity of other applications of the Rules.

Appellants then moved in the district court for a judgment under Federal Rule of Civil Procedure 54(c). They sought a declaratory judgment that Rules 1186.1, 1193, and 1194 were invalid as applied to federal agencies and to private fleet operators' purchases of new vehicles, and sought an injunction against enforcement of those provisions.[1] Appellants contended that they were entitled to such a judgment based on the District's failure to defend those applications of the Rules in their briefing in the district court on Appellants' motion to implement the Supreme Court's decision. On September 22, 2005, the district court denied the motion, noting that since Appellants were not the party "in whose favor [the judgment was] rendered," they were not entitled to a judgment under Rule 54(c). Fed. R. Civ. P. 54(c).

Finally, Appellants moved in the district court for entry of final judgment under Federal Rule of Civil Procedure 58 in accordance with the court's orders of May 6 and September 22, 2005. On October 7, 2005, the district court entered a final judgment dismissing Appellants' suit with prejudice for the reasons given in its order of May 6. Appellants timely appealed.

---

[1]The requested declaratory judgment also included relief from Fleet Rule 1195, pertaining to school buses. However, Appellants' First Amended Complaint did not request relief from this Rule, and Appellants do not argue on appeal that they are entitled to such relief."

## II.   Discussion

Appellants contend that the district court made two errors. First, they contend that the district court erred in holding that the market participant doctrine saved any applications of the Rules from preemption. Second, they contend that, even if the Rules are not preempted as applied to state and local government entities, the district court erred in dismissing Appellants' suit rather than determining which applications were preempted and which were not.

We affirm the district court's holding that the Clean Air Act does not preempt the Fleet Rules insofar as they direct the procurement behavior of state and local governmental entities. However, we agree with Appellants' second contention and remand to the district court for further proceedings to determine which, if any, of the Rules' other provisions are preempted.[2]

## A.   Preemption and the Market Participant Doctrine

The Supremacy Clause "invalidates state laws that 'interfere with, or are contrary to,' federal law." *Hillsborough County v. Automated Med. Labs., Inc.*, 471 U.S. 707, 712 (1985) (quoting *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 211 (1824)); *see* U.S. Const., art. VI, cl. 2. "Federal preemption

---

[2]We grant the District's request for judicial notice of the transcript of the Supreme Court's oral argument in this case, a public report issued by California's Air Resources Board, and the municipal ordinance at issue in *Cardinal Towing & Auto Repair, Inc. v. City of Bedford*, 180 F.3d 686 (5th Cir. 1999). The Los Angeles Taxi Industry, as amicus curiae, is alone in opposing the request and opposes only our taking notice of the *Cardinal Towing* ordinance. Municipal ordinances are proper subjects for judicial notice. *Santa Monica Food Not Bombs v. City of Santa Monica*, 450 F.3d 1022, 1025 n.2 (9th Cir. 2006). The ordinance at issue in *Cardinal Towing* is relevant given our adoption of that case's analysis in *Chamber of Commerce v. Lockyer*, 463 F.3d 1076, 1084 (9th Cir. 2006) (en banc), the principal case on which Appellants' preemption argument relies.

occurs when: (1) Congress enacts a statute that explicitly pre-empts state law; (2) state law actually conflicts with federal law; or (3) federal law occupies a legislative field to such an extent that it is reasonable to conclude that Congress left no room for state regulation in that field." *Tocher v. City of Santa Ana*, 219 F.3d 1040, 1045-46 (9th Cir. 2000), *abrogated on other grounds by City of Columbus v. Ours Garage & Wrecker Serv., Inc.*, 536 U.S. 424, 431-34 (2002).

"Preemption analysis 'start[s] with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.' " *City of Columbus*, 536 U.S. at 438 (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)). "Congressional intent, therefore, is the ultimate touchstone of preemption analysis." *Tocher*, 219 F.3d at 1045 (internal quotation marks omitted). "When . . . Congress adopts a statute that provides a reliable indication of Congressional intent regarding preemption, the scope of federal preemption is determined by the statute. . . . 'Congress' enactment of a provision defining the pre-emptive reach of a statute implies that matters beyond that reach are not pre-empted.' " *Id.* (quoting *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 517 (1992)).

### 1. Market Participant Doctrine

[1] The market participant doctrine distinguishes between a state's role as a regulator, on the one hand, and its role as a market participant, on the other. Actions taken by a state or its subdivision as a market participant are generally protected from federal preemption. The doctrine was originally developed in a series of dormant Commerce Clause cases. In *Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794 (1976), the Supreme Court held that Maryland did not violate the Commerce Clause by favoring in-state processors of scrap metal when participating in the market for scrap metal. *Id.* at 809-10. Subsequently, in *Reeves, Inc. v. Stake*, 447 U.S. 429 (1980), the Court held that South Dakota, as a seller of

cement, was free to discriminate in a time of shortage by selling cement only to in-state users. The Court was moved by "considerations of state sovereignty, the role of each State as guardian and trustee for its people, and the long recognized right of trader or manufacturer, engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal." *Id.* at 438-39 (footnotes, citations, and internal quotation marks omitted). "Even-handedness suggests that, when acting as proprietors, States should similarly share existing freedoms from federal constraints, including the inherent limits of the Commerce Clause." *Id.* at 439. The Court stated that in market participant cases, courts undertake "a single inquiry: whether the challenged program constituted direct state participation in the market." *Id.* at 435 n.7 (internal quotation marks omitted); *accord White v. Mass. Council of Constr. Employers, Inc.*, 460 U.S. 204, 208 (1983) (citing *Reeves*' "single inquiry" in upholding executive order requiring all Boston construction projects funded by city funds to be performed by work forces of at least half city residents).

After the development of the market participant doctrine in these dormant Commerce Clause cases, the Supreme Court and the lower federal courts have applied the doctrine to protect proprietary state action from preemption by various federal statutes. *See, e.g.*, *Building & Constr. Trades Council v. Associated Builders & Contractors* ("*Boston Harbor*"), 507 U.S. 218, 226-27 (1993) (National Labor Relations Act); *Tocher*, 219 F.3d at 1048-50 (Federal Aviation Administration Authorization Act of 1995 ("FAAA")); *Associated Gen. Contractors v. Metro. Water Dist.*, 159 F.3d 1178, 1183 (9th Cir. 1998) (Employee Retirement Income Security Act of 1974).

**[2]** In the statutory preemption context, the market participant doctrine is based on the proposition that "pre-emption doctrines apply only to state *regulation*." *Boston Harbor*, 507 U.S. at 227. "Not all actions by state or local government enti-

ties . . . constitute regulation, for such an entity, like a private person, may buy and sell or own and manage property in the marketplace." *Sprint Spectrum L.P. v. Mills*, 283 F.3d 404, 417 (2d Cir. 2002). Thus, even where a federal statute preempts state regulation in an area, state action in that area is not preempted so long as it is proprietary rather than regulatory. The Supreme Court has stated the rule in the negative: "In the absence of any express or implied indication by Congress that a State may not manage its own property when it pursues its purely proprietary interests, and where analogous private conduct would be permitted, this Court will not infer such a restriction." *Boston Harbor*, 507 U.S. at 231-32.

**[3]** In considering the scope of the market participant doctrine for purposes of preemption under the National Labor Relations Act, we have adopted the Fifth Circuit's test for distinguishing "proprietary" from "regulatory" action. In *Lockyer*, we held that state action qualifies as proprietary in either of two circumstances. First, state action is proprietary if it "essentially reflect[s] the [governmental] entity's own interest in its efficient procurement of needed goods and services, as measured by comparison with the typical behavior of private parties in similar circumstances." 463 F.3d at 1084 (quoting *Cardinal Towing*, 180 F.3d at 693). In these circumstances, the market participant doctrine "protects comprehensive state policies with wide application from preemption, so long as the type of state action is essentially proprietary." *Id*. Second, state action is proprietary if "the narrow scope of the challenged action defeat[s] an inference that its primary goal was to encourage a general policy rather than address a specific proprietary problem." *Id*. (quoting *Cardinal Towing*, 180 F.3d at 693). Thus, the doctrine also "protects narrow spending decisions that do not necessarily reflect a state's interest in the efficient procurement of goods or services, but that also lack the effect of broader social regulation." *Id*.

**[4]** Along with three other circuits, we have held that the market participant doctrine's protection of state proprietary

action includes proprietary action by states' political subdivisions. *Big Country Foods, Inc. v. Bd. of Educ.*, 952 F.2d 1173, 1178-79 (9th Cir. 1992); *accord Nat'l Solid Waste Mgmt. Ass'n v. Williams*, 146 F.3d 595, 599-600 (8th Cir. 1998); *Smith Setzer & Sons, Inc. v. S.C. Procurement Review Panel*, 20 F.3d 1311, 1319-20 (4th Cir. 1994); *Trojan Techs., Inc. v. Pennsylvania*, 916 F.2d 903, 911 (3d Cir. 1990); *see also City of Columbus*, 536 U.S. at 437 ("The principle is well settled that local governmental units are created as convenient agencies for exercising such of the governmental powers of the State as may be entrusted to them in its absolute discretion." (quoting *Wis. Pub. Intervenor v. Mortier*, 501 U.S. 597, 607-08 (1991)); *Bldg. & Constr. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28, 34 (D.C. Cir. 2002) (upholding under market participant doctrine a rule prohibiting federal agencies and entities receiving federal construction funds from requiring contractors to enter, or prohibiting them from entering, project labor agreements); *id.* at 35 ("[T]here is simply no logical justification for holding that if an executive order establishes a consistent practice regarding the use of [such labor agreements], it is regulatory even though the only decision governed by the executive order are those that the federal government makes as a market participant." (internal quotation marks and alteration omitted)). *But see W.C.M. Window Co. v. Bernardi*, 730 F.2d 486, 495-96 (7th Cir. 1984) (as amended) (holding that state regulation did not fall within market participant exception because it was not limited to the state's contracts, but also included those of local government entities).

The central question presented in this appeal is whether the Clean Air Act preempts the Fleet Rules insofar as they apply to state and local government entities. The answer turns on the applicability and scope of the market participant doctrine as it relates to preemption under the Act. Because the market participant doctrine is not a wholly freestanding doctrine, but rather a presumption about congressional intent, the doctrine may have a different scope under different federal statutes. It

is possible that some aspects of the doctrine have a constitutional dimension, protecting certain sovereign actions of the states from unconstitutional interference by the federal government. *Cf. Nat'l League of Cities v. Usery*, 426 U.S. 833, 841-44, 854-55 (1976), *overruled by Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 557 (1985). But we need not pursue the constitutional issue here, for — whatever the precise scope of the market participant doctrine under the Clean Air Act — we are presented with a statutory question under the Act rather than a constitutional question under the Tenth Amendment.

2. Market Participant Doctrine Under the Clean Air Act

The district court's decision in this case appears to be the first of any court to analyze the market participant doctrine under the federal Clean Air Act. Because congressional intent is the key to preemption analysis, we must consider whether the Act contains "any express or implied indication by Congress" that the presumption embodied by the market participant doctrine should not apply to preemption under the Act. *Boston Harbor*, 507 U.S. at 231.

The Clean Air Act largely preserves the traditional role of the states in preventing air pollution. *Cf. Exxon Mobil Corp. v. EPA*, 217 F.3d 1246, 1255 (9th Cir. 2000) ("Air pollution prevention falls under the broad police powers of the states, which include the power to protect the health of citizens in the state."). As we have previously noted, "[t]he overriding purpose of the Clean Air Act is to force the states to do *their* job in regulating air pollution effectively so as to achieve baseline air quality standards, the [national ambient air quality standards ('NAAQS')]." *Id.* (emphasis added); *see also* 42 U.S.C. § 7408(a). Indeed, the Act's congressional findings state that "air pollution prevention (that is, the reduction or elimination, through any measures, of the amount of pollutants produced or created at the source) and air pollution control at its source

is the primary responsibility of States and local governments." 42 U.S.C. § 7401(a)(3).

States discharge their primary responsibility for attaining and maintaining the NAAQS through their state implementation plans ("SIPs"). *See id.* § 7410. The section of the Act concerning SIPs reaffirms the primary responsibility of the states: "Each State shall have the primary responsibility for assuring air quality within the entire geographic area comprising such State by submitting an implementation plan for such State which will specify the manner in which national primary and secondary ambient air quality standards will be achieved and maintained within each air quality control region in such State." *Id.* § 7407(a).

The Act also contains a provision titled "Retention of State authority." *Id.* § 7416. That section provides that, with certain exceptions, "nothing in this chapter shall preclude or deny the right of any State or political subdivision thereof to adopt or enforce (1) any standard or limitation respecting emissions of air pollutants or (2) any requirement respecting control or abatement of air pollution." *Id.*

Appellants concede, and we agree, that the market participation doctrine applies to preemption under § 209(a) and § 177 of the Clean Air Act. Neither of these two provisions indicates that Congress intended to extend the provisions' reach to preempt state proprietary action.

Section 209(a) provides, in its entirety:

> No State or any political subdivision thereof shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines subject to this part. No State shall require certification, inspection, or any other approval relating to the control of emissions from any new motor vehicle or new motor vehicle

engine as condition precedent to the initial retail sale, titling (if any), or registration of such motor vehicle, motor vehicle engine, or equipment.

42 U.S.C. § 7543(a).

[5] Section 209(a) prevents a state (absent a waiver granted to the State of California under § 209(b)) from imposing emissions standards more stringent than or otherwise different from the federal standards. However, the section contains nothing to indicate a congressional intent to bar states from choosing to use their own money to acquire or use vehicles that exceed the federal standards. Inferring such a limit on state proprietary action would run afoul of the presumption articulated in *Boston Harbor*, 507 U.S. at 231-32. It would also run afoul of the Clean Air Act's express reservation to the states of primary authority over and responsibility for controlling air pollution.

[6] Section 177 is a corollary to § 209(b) of the Act. Section 209(b) provides that the EPA "shall" grant the State of California a waiver from § 209(a) preemption to adopt and enforce its own emission standards, provided that California has determined that the standards are, "in the aggregate, at least as protective of public health and welfare as applicable Federal standards." *Id*. § 7543(b)(1); *see also Motor & Equip. Mfrs. Ass'n, Inc. v. EPA*, 627 F.2d 1095, 1108-11 (D.C. Cir. 1979) (as amended) (discussing the history and purpose of § 209(b)); *Am. Auto. Mfrs. Ass'n v. Cahill*, 152 F.3d 196, 198-99 (2d Cir. 1998) (describing the standards California has promulgated under § 209(b) waivers, codified at Cal. Code Regs. tit. 13, §§ 1900 *et seq*.).[3] Section 177 provides that states other than California may require that vehicles sold in their state comply with standards that are "identical to the California standards for which a waiver has been granted [under

_____

[3]There is no contention that California has obtained a waiver for the Fleet Rules under § 209(b).

§ 209(b)] for such model year." 42 U.S.C. § 7507. Like § 209(a), § 177 contains no language impliedly or expressly limiting states' proprietary action, and we decline to infer such a limit for the reasons just stated regarding § 209(a).

An amicus, the Los Angeles Taxi Industry ("LATI"), argues that the market participation doctrine does not apply to preemption analysis under any section of the Clean Air Act. Another amicus, the American Automotive Leasing Association ("AALA"), argues that § 246 of the Act preempts the Fleet Rules even as they apply to state and local governments. "Generally, we do not consider on appeal an issue raised only by an amicus." *Chaker v. Crogan*, 428 F.3d 1215, 1220 (9th Cir. 2005) (quoting *Swan v. Peterson*, 6 F.3d 1373, 1383 (9th Cir. 1993)). However, because the central question in this case is the applicability and scope of the market participant exception under the Clean Air Act, and because there are ready answers, we respond to LATI's and AALA's arguments.

LATI argues that the market participant doctrine is not applicable to preemption analysis under the Clean Air Act based on our suggestion in dictum in *Hydrostorage, Inc. v. N. Cal. Boilermakers Local Joint Apprenticeship Comm.*, 891 F.2d 719, 730 (9th Cir. 1989), that the market participant doctrine does not exist outside the dormant Commerce Clause context. We have since acknowledged, however, that our dictum in *Hydrostorage* was not the product of "deep consideration," given that in *Hydrostorage* we held that the action was regulatory rather than proprietary. *Associated Gen. Contractors*, 159 F.3d at 1184. Moreover, as we have also noted, our dictum was abrogated by *Boston Harbor*, which applied the market participant doctrine to preemption under the NRLA. *Id.* (citing *Boston Harbor*). LATI asserts that *Boston Harbor* is distinguishable because it "did not involve express preemption." However, *Boston Harbor* does not support a distinction between express and other forms of preemption. *Boston Harbor* holds that the Court will not "infer" preemption of propri-

etary action unless Congress "indicat[es] . . . that a State may not manage its own property when it pursues its purely proprietary interests." 507 U.S. at 231. LATI does not point us to any such indication by Congress in the Clean Air Act. *See also Tocher*, 219 F.3d at 1050 (holding that market participant doctrine protected portion of a city ordinance from express preemption by 49 U.S.C. § 14501(c)).

**[7]** AALA argues that § 246 of the Clean Air Act, 42 U.S.C. § 7586, precludes application of the market participant doctrine. Section 246 requires that states with certain nonattainment areas adopt specified rules for "centrally fueled fleets" as part of their SIPs. Section 246 does not mention government-owned fleets, but under chapter-wide definitions "covered fleets" include both private and government-owned fleets. *See* 42 U.S.C. §§ 7581(5), 7602(e). AALA does not argue that adhering to the Fleet Rules in procuring vehicles would cause state and local entities to fail to meet SIP-imposed fleet standards. Rather, AALA argues that the Rules conflict with § 246 because, under SIPs promulgated by a state pursuant to § 246, a fleet operator "shall" have "the choice of clean-fuel vehicles and clean alternative fuels," *id.* § 7586(d), whereas the Rules preclude fleet operators from making that choice. This conflict between § 246 and the Fleet Rules might support a holding that the Rules are preempted as applied to private fleet operators. However, it does not support a holding that the § 209(a) and § 177 preempt the Rules as applied to state and local governments acting in their capacities as fleet operators. The requirement that a state's SIP give fleet operators a choice among fuels and vehicles is entirely consistent with the state's own ability to choose to purchase particular fuels and vehicles in its proprietary capacity as a fleet operator.

**[8]** We therefore conclude that § 209(a), § 177, and § 246 of the Clean Air Act do not contain any express or implied indication of congressional intent that they should extend to state proprietary action.

### 3.  Scope and Application of the Doctrine

Appellants contend that even though the market participant doctrine protects a state's proprietary action from Clean Air Act preemption, the doctrine does not protect the Fleet Rules. According to Appellants, all of the Fleet Rules' provisions constitute regulatory rather than proprietary action under either of *Lockyer*'s two categories of state proprietary action.[4]

As an initial matter, we note that our analysis in *Lockyer* addressed the market participant doctrine in the context of preemption by the National Labor Relations Act ("NLRA"). While the Clean Air Act expressly reserves to the states their traditional police powers in regulating pollution except in a few limited areas of express preemption, the NLRA preempts broad swaths of state labor regulation. *Compare Exxon Mobil*, 217 F.3d at 1254-56, *with Boston Harbor*, 507 U.S. at 224-26 (describing the NLRA preemption doctrines "prohibit[ing state] regulation even of activities that the NLRA only *arguably* protects or prohibits" and "of areas that [Congress] left to be controlled by the free play of economic forces" (internal quotation marks omitted; emphasis in original)). Due regard for congressional intent requires that we not mechanically apply our market participant analysis in *Lockyer* to preemption analyses of federal statutes other than the NLRA. Depending on Congress's intent, another statute might require us to employ a definition of protected state "proprietary action" different from the two definitions adopted in *Lockyer* for purposes of preemption under the NLRA.

Nevertheless, in the case before us, we need not consider

---

[4]Appellants' arguments on this issue conflict with their counsel's concessions at oral argument before the Supreme Court. Appellants' counsel conceded — as did the Solicitor General (as amicus curiae in support of Appellants) — that the Rules were not preempted insofar as they applied only to state and local government purchases. Transcript of Oral Argument at 6-8, 20-25, 28, 541 U.S. 246 (2004) (No. 02-1343).

other possible definitions of "proprietary action," for the Fleet Rule provisions governing purchasing, procuring, leasing, and contracting for the use of vehicles by state and local governmental entities fall squarely within *Lockyer*'s first category of state proprietary action. That is, these provisions "essentially reflect the [state] entity's own interest in its efficient procurement of needed goods and services, as measured by comparison with the typical behavior of private parties in similar circumstances." *Lockyer*, 463 F.3d at 1084 (quoting *Cardinal Towing*, 180 F.3d at 693).

As described in greater detail above, Fleet Rule 1186.1 directs state and local government entities to meet certain criteria when purchasing or leasing street sweepers and, if feasible to do so, when contracting for use of street sweepers; Rule 1191 directs the same state entities to choose vehicles that meet certain criteria when procuring or leasing cars, light-duty trucks, and medium-duty vehicles; Rule 1192 directs them to meet certain criteria when procuring or leasing vehicles for public transit fleets; Rule 1193 directs them to meet certain criteria when procuring or leasing solid waste collection vehicles; Rule 1194 directs them to meet certain criteria when procuring, purchasing, or leasing vehicles for transportation providing ground access to airports; and Rule 1196 directs them to meet certain criteria when procuring, purchasing, or leasing heavy-duty vehicles.

We conclude that these provisions directing state and local governmental entities to purchase, procure, lease, or contract for use of vehicles meeting specified air pollution criteria constitute direct state participation in the market. We so conclude even though not only the state, but also some of its political subdivisions, are directed to take these actions. *See Big Country Foods*, 952 F.2d at 1179 ("A state should not be penalized for exercising its power through smaller, localized units; local control fosters both administrative efficiency and democratic governance.").

**[9]** Appellants object to this conclusion on three grounds. First, they contend that the Fleet Rules are not concerned with "efficient procurement" within the meaning of *Lockyer*, 463 F.3d at 1084, because the Rules' purpose is to reduce air pollution. Appellants point to the legislative history of the statute pursuant to which the Rules were adopted, California Health & Safety Code § 40447.5, which makes this purpose clear. We do not regard this purpose as fatal to the Rules. That a state or local governmental entity may have policy goals that it seeks to further through its participation in the market does not preclude the doctrine's application, so long as the action in question is the state's own market participation. *See, e.g.*, *Alexandria Scrap*, 426 U.S. at 809 ("Maryland entered the market for the purpose, agreed by all to be commendable as well as legitimate, of protecting the State's environment. As the means of furthering this purpose, it elected the payment of state funds in the form of bounties to encourage the removal of automobile hulks from Maryland streets and junkyards."); *Boston Harbor*, 507 U.S. at 229, 232 (upholding against an NLRA preemption challenge a requirement that all contractors on a public construction project adhere to a prehire labor agreement and noting that the Court had *not* held in *Wis. Dep't of Indus., Labor & Human Relations v. Gould Inc.*, 475 U.S. 282 (1986), that purchasing decisions "may never be influenced by labor considerations"); *Big Country Foods*, 952 F.2d at 1175 (upholding Alaska statute requiring school districts to pay up to 7 percent more for milk in order to purchase in-state milk rather than out-of-state milk); *see also N. Ill. Chapter of Associated Builders & Contractors, Inc. v. Lavin*, 431 F.3d 1004, 1007 (7th Cir. 2005) ("Federal preemption doctrine evaluates what legislation *does*, not why legislators voted for it or what political coalition led to its enactment."); *id.* (noting that in *Boston Harbor*, "Boston wanted to clean up its harbor, but there can be little doubt that it also wanted to shower benefits on workers who were the incumbents' political supporters"); *cf. Gould*, 475 U.S. at 288 (holding that Wisconsin law prohibiting state procurement agents from purchasing products from repeat NLRA violators

was not protected by the market participant doctrine because the statute "function[ed] unambiguously as a supplemental sanction for violations of the NLRA" rather than as state proprietary action); *Lockyer*, 463 F.3d at 1084-85 (holding state action not proprietary where statute placed spending restrictions related to labor organizing on all private employers receiving more than $10,000 in state funds).

In arguing that the Fleet Rules are not concerned with "efficient procurement" by state and local governments within the meaning of *Lockyer*, Appellants read the word "efficient" too narrowly. "Efficient" does not merely mean "cheap." In context, "efficient procurement" means procurement that serves the state's purposes — which may include purposes other than saving money — just as private entities serve their purposes by taking into account factors other than price in their procurement decisions. *See Boston Harbor*, 507 U.S. at 231 ("To the extent that a private purchaser may choose a contractor based upon that contractor's willingness to enter into a prehire agreement, a public entity *as purchaser* should be permitted to do the same."); *see also id.* at 230-32 (comparing state's labor agreement to private construction firms' agreements).

**[10]** Tellingly, Appellants do not argue that the Fleet Rules fall outside *Lockyer*'s first definition of state proprietary action on the ground that private fleet operators do not take air pollution concerns into account when making their procurement decisions. Such an argument would be contradicted by evidence presented in this case that two prominent private fleet owners, FedEx and UPS, have, for their own purposes, adopted programs to introduce less-polluting vehicles into their fleets. There is therefore no basis for concluding that purchasing less-polluting vehicles is not a purpose that a state may pursue as a market participant.

Second, Appellants contend that the Fleet Rules do not constitute proprietary action because they "do not control the dis-

position of any state funds or property." That is, the Rules direct not how the State of California shall spend its own money, but rather how political subdivisions of the state shall spend their money. This argument is largely foreclosed by *Big Country Foods*, in which we held that the market participant doctrine saved from a dormant Commerce Clause challenge an Alaska statute that directed the purchase of milk by local school districts. 952 F.2d at 1178-80. There, we rejected an analogous argument that the market participant doctrine did not apply because, although Alaskan school districts entered into the milk contracts, federal funds ultimately paid for the milk: "Federal funds provide the wherewithal to make the milk purchases, but it is Alaska that is the direct participant in the market. Accordingly, the market participant exception applies." *Id.* at 1180. In so holding, we rejected what we saw as "strong public policy arguments to the contrary," because such arguments "extend the debate beyond the 'single inquiry' the Supreme Court demands: 'whether the challenged program constituted direct state participation in the market.' " *Id.* (internal quotation marks omitted) (quoting *White*, 460 U.S. at 208 (quoting *Reeves*, 447 U.S. at 436 n.7)); *see also Cardinal Towing*, 180 F.3d at 696 (holding doctrine protected towing ordinance from FAAA preemption where ordinance governed city contracts for "nonconsensual" towing services ultimately paid for by the people whose cars were towed).

**[11]** Like Alaska's milk ordinance, the Fleet Rules constitute direct state participation in the market. The Rules are a state directive determining which vehicles the state and its political subdivisions will procure. While it is true that the local governments may spend their own money rather than the state's in complying with the Rules, this fact is not inconsistent with the doctrine. Appellants do not contend that the State of California lacks the power under state law to compel its political subdivisions to purchase particular vehicles and to spend local funds in so doing. We cannot discern any reason why the market participant doctrine should not apply merely because the state, which has the legal right under state law to

direct the actions of local governments, directs the expenditure of local rather than state funds.[5]

Third, Appellants contend that the Fleet Rules are regulatory rather than proprietary because they are enforceable by criminal sanctions and fines. However, Appellants do not explain why such enforcement provisions preclude the application of the market participant doctrine. They assert in their brief only that in *Lockyer* we "emphasized the enforcement provisions of the statute as reinforcing [its] regulatory character." In fact, we merely mentioned the existence of enforcement provisions, 463 F.3d at 1085, and did so in the context of a statute that quite plainly functioned as regulatory rather than proprietary action, irrespective of any means chosen to enforce it. Here, by contrast, the provisions of the Fleet Rules directed to the procurement decisions of the state and local governments clearly constitute proprietary action within the meaning of the market participant doctrine.

**[12]** We do not believe that the enforcement provisions have the effect of transforming the Rules from proprietary to regulatory action. It is unclear whether the criminal sanctions and fines provided in the Fleet Rules are intended to be, or

---

[5]During oral argument in the Supreme Court, Appellants' counsel appears to have conceded this point, arguing only that the state could not control criteria for fleet purchases by entities other than local governments:

Q: And could [the state] also do that for all their governmental subdivisions? The State of Nebraska says that the State and all of its subdivisions will have some very strict standards —

A: I agree with the . . . way that the Chief Justice put it, that that's their own purchasing decisions, and it's a matter of State law as to whether they can — but that is not what this case is about. This case is about whether the South Coast district can impose those standards, including Federal Government vehicles, postal vehicles, FBI vehicles, private vehicles that go to the airports and so forth.

Transcript of Oral Argument at 25, 541 U.S. 246 (2004) (No. 02-1343).

are, enforceable against government entities, as distinct from private parties. But even if they are so enforceable, we do not see how action by a state or local government that is proprietary when enforced by one mechanism loses its proprietary character when enforced by some other mechanism.

As part of their argument that the Rules are regulatory, Appellants contend that protecting the Fleet Rules from preemption under the market participant doctrine "would seriously undermine the uniformity contemplated by § 209(a)." They assert that "purchases by government entities . . . in the aggregate no doubt represent a very substantial segment of the market." However, Appellants cite no evidence from the record in support of an argument based on the market share of the state and local governments, and we see no such evidence. Nor do Appellants cite any case in which a court has held that a state's market power was so great as to preclude the application of the market participant doctrine. *Cf. Reeves*, 447 U.S. at 437 (holding that South Dakota, as a seller of cement, was free to discriminate in a time of shortage by selling cement only to in-state users). Congress is of course free to amend § 209(a) to eliminate the market participant doctrine's presumption of non-preemption if Congress finds that state proprietary action has undermined § 209(a)'s purpose.

**[13]** For the foregoing reasons, we hold that the Fleet Rule provisions directing state and local governments to purchase, procure, lease, and contract for use of vehicles meeting certain criteria fall within *Lockyer*'s first category of proprietary state action because they "essentially reflect [California's] own interest in its efficient procurement of needed goods and services." *Lockyer*, 463 F.3d at 1084 (quoting *Cardinal Towing*, 180 F.3d at 693). The market participant doctrine therefore saves those provisions of the Fleet Rules from preemption by the Clean Air Act, and we need not consider whether the Rules also fall within *Lockyer*'s second category of state proprietary action. *See id.* (classifying as proprietary "narrow spending decisions that do not necessarily reflect a

state's interest in the efficient procurement of goods or services, but that also lack the effect of broader social regulation").

### B.   Other Provisions of the Fleet Rules

Appellants contend that the district court erred in refusing to consider whether the Clean Air Act preempts the other provisions of the Fleet Rules that are not protected by the market participant doctrine.

The Supreme Court stated in *United States v. Salerno*, 481 U.S. 739 (1987) that "[a] facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *Id.* at 745; *cf. Hotel & Motel Ass'n of Oakland v. City of Oakland*, 344 F.3d 959, 971-72 (9th Cir. 2003) (following this rule from *Salerno* but noting that a plurality of the Supreme Court deemed it dictum and questioned its viability in *City of Chicago v. Morales*, 527 U.S. 41, 55 n.22 (1999)). We agree with the district court's conclusion that Appellants brought a facial challenge to the Fleet Rules. Appellants' First Amended Complaint requested declaratory and injunctive relief on the ground that the Rules were preempted in their entirety by the Clean Air Act. Nothing in that complaint indicated that Appellants were bringing an as-applied challenge; the complaint sought invalidation of the Rules *in toto* without reference to any particular application.

At oral argument before the Supreme Court, counsel for Appellants stated that they had brought "a facial challenge" and were "claiming total preemption." Transcript of Oral Argument at 4, 541 U.S. 246 (2004) (No. 02-1343). On remand, Appellants again reiterated their contention that the Fleet Rules were wholly preempted in their "Motion for Order Implementing the Supreme Court's Decision." The motion requested (1) a declaration that the Fleet Rules "are pre-

empted by Section 209(a) . . . and are invalid in their entirety" and (2) an injunction preventing the District "from enforcing or attempting to enforce any of the provisions of any of the Fleet Rules."

**[14]** Given Appellants' failure on remand to make a more fine-grained preemption argument, we have sympathy for the decision of the district court that, because certain Fleet Rule provisions were protected by the market participant doctrine, Appellants' facial challenge entirely failed under *Salerno*. Nevertheless, we conclude that the district court, after holding that the market participant doctrine protects from preemption the provisions governing procurement decisions by the state and local governments, should have gone on to address whether the remaining provisions were preempted. Where a plaintiff challenges an enactment as *prima facie* invalid, *Salerno* requires the plaintiff to show that there can be no valid application of a particular challenged provision. However, *Salerno* does not require a plaintiff to show that every provision within a particular multifaceted enactment is invalid. "When a statute contains unobjectionable provisions that are separable from those found to be unconstitutional, a court reviewing the statute should maintain the statute in so far as it is valid." *Nat'l Collegiate Athletic Ass'n v. Miller*, 10 F.3d 633, 640 (9th Cir. 1993) (citing *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 684 (1987)). In other words, some of the provisions might be facially invalid, and might not.

**[15]** Each Fleet Rule contains multiple provisions, placing restrictions on specific lists of public or private entities. Those provisions within the Rules that constitute state proprietary action are valid *provisions*, not valid applications of a single, unseverable provision. *Cf. Tocher*, 219 F.3d at 1050 (holding that one provision of towing ordinance was preempted, that another provision escaped preemption under the market participant exception, and that "there [was] no need to strike down the [ordinance] in its entirety" due to a severability clause). We therefore remand to the district court for it to

decide in the first instance whether the remaining provisions of the Fleet Rules are preempted by the Clean Air Act.[6]

## Conclusion

We affirm the district court's holding that, under the market participant doctrine, the Clean Air Act does not preempt those provisions of the Fleet Rules directing state and local governmental entities' purchasing, procuring, leasing, and contracting decisions. We vacate the district court's dismissal of Appellants' claims with the respect to the Fleet Rules' other provisions. We also grant the District's request for judicial notice. We remand for further proceedings not inconsistent with this opinion.

**AFFIRMED** in part; **VACATED** in part; and **REMANDED.** Each side shall bear its own costs on appeal.

---

[6]We note that the record before us contains an "Advisory Notice to Fleets Subject to SCAQMD Fleet Vehicle Rules 1186.1, 1191, 1192, 1193, 1194, 1195, and 1196," dated July 20, 2005. The Advisory Notice states that, following the district court's May 6, 2005 order, the Fleet Rules would be enforced only "as they apply to state and local public entities" or "private entities under contract to state or local public entities," and would not be "affirmatively enforce[d]" as applied "to private entities that are not under contract to state or local public entities" or to "federal public entities." We cannot conclude, on the basis of this Advisory Notice alone, that Appellants' case is moot. *Cf. City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982) ("Mere voluntary cessation of allegedly illegal conduct does not moot a case . . . ." (internal quotation marks omitted)). We leave it to the district court to determine whether any other events not reflected in the record before us have rendered the case moot.