**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

AIRLINE SERVICE PROVIDERS
ASSOCIATION,
       *Plaintiff-Appellant*,

     and

AIR TRANSPORT ASSOCIATION OF
AMERICA, INC., DBA Airlines of
America,
       *Plaintiff*,

     v.

LOS ANGELES WORLD AIRPORTS;
CITY OF LOS ANGELES,
       *Defendants-Appellees.*

No. 15-55571

D.C. No.
2:14-cv-08977-
JFW-PJW

AIRLINE SERVICE PROVIDERS
ASSOCIATION,

*Plaintiff*,

and

AIR TRANSPORT ASSOCIATION OF
AMERICA, INC., DBA Airlines for
America,

*Plaintiff-Appellant*,

v.

LOS ANGELES WORLD AIRPORTS;
CITY OF LOS ANGELES,

*Defendants-Appellees.*

No. 15-55572

D.C. No.
2:14-cv-08977-
JFW-PJW

OPINION

Appeal from the United States District Court
for the Central District of California
John F. Walter, District Judge, Presiding

Argued and Submitted January 13, 2017
Pasadena, California

Filed August 23, 2017

Before:  Richard C. Tallman and Michelle T. Friedland,
Circuit Judges, and William H. Orrick, III,[*] District Judge.

---

[*] The Honorable William H. Orrick III, United States District Judge
for the Northern District of California, sitting by designation.

Opinion by Judge Friedland;
Dissent by Judge Tallman

**SUMMARY**[**]

**Labor Law**

The panel affirmed in part and vacated in part the district court's dismissal of an action brought by two air transport trade associations asserting that the City of Los Angeles, in its capacity as proprietor of Los Angeles International Airport, may not require businesses at the airport to accept a contractual condition concerning labor agreements.

Airlines that operate out of LAX hire third-party businesses to refuel and load planes, take baggage and tickets, help disabled passengers, and provide similar services.  The City licenses those service providers using a contract that imposes certain conditions.  One such condition, section 25, requires service providers to enter a "labor peace agreement" with any employee organization that requests one.  The trade associations argued that, because the City operates LAX, the contractual conditions in LAX's standard licensing agreement are effectively municipal regulations.  The associations contended that section 25, as one such "regulation," was preempted by the National Labor Relations Act, the Railway Labor Act, and the Airline Deregulation Act.

---

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

The panel held that the Airline Service Providers Association had associational standing to pursue all of its claims.

Affirming in part, the panel held that the associations failed to state a preemption claim.  The panel concluded that the City was acting as a market participant, and not a regulator, when it added section 25 to its LAX licensing contract because, under the *Cardinal Towing* test, the City was attempting to avoid disruption of its business, and the decision to adopt section 25 was narrowly tied to a specific proprietary problem.  The panel also concluded that the preemption provisions of the NLRA, the RLA, and the ADA do not apply to state and local governmental actions taken as a market participant.

Vacating in part, the panel held that the district court erred by denying leave to amend the complaint because the associations possibly could allege large spillover effects that would substantiate their claim that, in reality, section 25 acts as a regulation.  The panel remanded to allow the district court to enter a dismissal with leave to amend.

Concurring in part and dissenting in part, Judge Tallman agreed with the majority that the ASPA had standing to assert its claims and should also at least be granted leave to amend its complaint.  Judge Tallman disagreed with the majority's conclusion that, as is, the complaint failed to state a plausible claim that the City enacted section 25 as a regulatory measure rather than a proprietary one.  He wrote that the complaint sufficiently alleged that section 25 was an overly broad and facially suspect regulation of labor relations that contravened the delicate congressional balancing of national labor relations policy affecting key facilities of interstate commerce.

**COUNSEL**

Michael M. Berger (argued), Matthew P. Kanny, and Maura Kingseed Gierl, Manatt Phelps & Phillips LLP, Los Angeles, California, for Plaintiff-Appellant Airline Service Providers Association.

Robert Span (argued), and Douglas R. Painter, Steinbrecher & Span LLP, Los Angeles, California; Douglas W. Hall, Ford and Harris LLP, Washington, D.C.; for Plaintiff-Appellant Air Transport Association of America.

Richard G. McCracken (argued) and Paul L. More, Davis Cowell & Bowe LLP, San Francisco, California; Scott P. Lewis and David S. Mackey, Anderson & Krieger LLP, Cambridge, Massachusetts; for Defendants-Appellees.

**OPINION**

FRIEDLAND, Circuit Judge:

We must decide whether the City of Los Angeles, which operates Los Angeles International Airport ("LAX"), can require businesses at the airport to accept certain contractual conditions aimed at preventing service disruptions.[1] Two air transport trade associations argue that the conditions are, in effect, municipal regulations preempted by federal labor law. We hold that the City may impose the conditions in its capacity as proprietor of LAX and thus affirm dismissal of the Complaint.

---

[1] Because the City of Los Angeles operates LAX, we refer in this opinion to both entities collectively as "the City."

## I. Background

Airlines that operate out of LAX hire third-party businesses to refuel and load planes, take baggage and tickets, help disabled passengers, and provide similar services.  The City licenses those service providers using a contract that imposes certain conditions.  One such condition, section 25, requires service providers to enter a "labor peace agreement" with any employee organization that requests one.[2]  If such an agreement is not finalized within sixty days, then the dispute must be submitted to mediation and, if mediation is unsuccessful, to binding arbitration.  Any labor peace agreement that results from this process must include "binding and enforceable" provisions that prohibit picketing, boycotting, stopping work, or "any other economic interference."

It might seem at first glance that a labor peace agreement would be detrimental to employees' interests because it deprives them of labor rights.  In practice, however, if an employer may not operate without such an agreement, the employer may need to give benefits to its employees to induce them to enter the agreement.  Employees have an incentive to trigger negotiations toward labor peace agreements to obtain such benefits.  Indeed, here, at least one organization of service employees advocated for inclusion of section 25 when the City was revising its standard LAX licensing contract.

Two trade associations who have members that operate at LAX brought suit in the United States District Court for

---

[2] Section 25 describes broadly the type of employee organization that can make this request and does not require the employees to be unionized.

the Central District of California to challenge section 25: Airline Service Providers Association ("ASPA"), an association of third-party service providers; and the Air Transport Association of America ("Airlines"), an association of American airlines. The associations argue that, because the City of Los Angeles operates LAX, the contractual conditions in LAX's standard licensing agreement are effectively municipal regulations. The associations contend that section 25, as one such "regulation," is preempted by two federal labor statutes—the National Labor Relations Act ("NLRA") and the Railway Labor Act ("RLA")—and by the Airline Deregulation Act ("ADA").

The district court dismissed the Complaint without leave to amend. It dismissed the labor law preemption claims for failure to state a claim and the ADA claim for lack of standing.

## II. Standing

The City challenges aspects of Plaintiffs' standing, and, in any event, we have an independent obligation to ensure that we have subject matter jurisdiction. *See, e.g.*, *United States v. McIntosh*, 833 F.3d 1163, 1173 (9th Cir. 2016). For the reasons that follow, we hold that the ASPA has standing to pursue all of its claims.[3]

An association like the ASPA has standing if (1) its individual members would have standing in their own right,

---

[3] So long as one plaintiff has standing, an appellate court has jurisdiction to address his claims regardless of whether other plaintiffs have standing. *See, e.g.*, *Rumsfeld v. Forum for Acad. & Inst'l Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006). Given our conclusion that the ASPA has standing, we need not evaluate the Airlines' standing.

(2) the interests at stake in the litigation are germane to the organization's purposes, and (3) the case may be litigated without participation by individual members of the association. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000) (citing *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).

To have standing in their own right, an association's members must have "suffered an injury in fact," that injury must be "fairly traceable to the challenged conduct of the defendant," and the injury must be "likely to be redressed" by a decision in their favor. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).

The ASPA has alleged a sufficient injury in fact. It alleges that its members will be forced into unwanted negotiations that must terminate in either an agreement or arbitral award—something virtually certain to occur given that an organization of service employees advocated for section 25, suggesting that employees plan to make use of the provision. We have recognized that "[t]he economic costs of complying with a licensing scheme can be sufficient for standing," *Mont. Shooting Sports Ass'n v. Holder*, 727 F.3d 975, 980 (9th Cir. 2013), even if "the extent of [the alleged] economic harm is not readily determinable," *Cent. Ariz. Water Conservation Dist. v. EPA*, 990 F.2d 1531, 1538 (9th Cir. 1993). Here, ASPA members will at least have to devote resources, and thus incur economic costs, to participate in negotiations, mediation, and possibly even binding arbitration over a labor peace agreement, which they

would not otherwise be required to discuss.  The time spent in those negotiations is itself a concrete injury.[4]

Second, the ASPA has shown a sufficient "line of causation" between the City's actions and this injury.  *See Allen v. Wright*, 468 U.S. 737, 757 (1984), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377 (2014).  The injuries it claims are directly linked to the City's conduct:  The City has made section 25 a mandatory component of its standard licensing contract for service providers at LAX, and section 25 will force service providers to spend time negotiating about a labor peace agreement.  This is a sufficient causal connection.  *See Cent. Ariz.*, 990 F.2d at 1538 (holding that economic injury caused by contractual obligations that stemmed from compliance with a regulation were sufficiently caused by the regulation to support standing).

Finally, the remedies the ASPA seeks would redress the harm it alleges.  *See Spokeo*, 136 S. Ct. at 1547.  If, as the Complaint requests, section 25 were enjoined on the basis of preemption by federal labor law or the ADA, the ASPA's members would not suffer any adverse consequences of complying with it.  *See Cent. Ariz.*, 990 F.2d at 1538 ("[The plaintiff's] economic injury is likely to be redressed by a favorable decision since elimination of the [rule in question] would necessarily eliminate the increased financial burden the rule causes.").

---

[4] Because this injury is sufficient to support standing, we need not consider whether the ASPA's allegations that its members will be forced to accede to employee demands during negotiations triggered under section 25 could support standing.

The ASPA's individual members would therefore have standing in their own right, and the first prong of the test for associational standing is satisfied.

The second and third prongs are satisfied as well. The ASPA alleges that it has an organizational interest "in the consistent enforcement of unitary federal regulation of airline industry labor relations." The association's asserted purpose is therefore related to its legal claims in this action—namely, that section 25 is preempted by federal statutes that regulate airlines—satisfying the germaneness prong. As to the third prong, the parties have identified no reason that the ASPA's members must participate individually in this case, and neither have we. The ASPA thus meets all the requirements for associational standing.[5]

## III. Lack of Preemption

Having concluded that the ASPA has standing, we now turn to whether its preemption arguments state a claim on which relief may be granted. We evaluate this question de novo. *Associated Gen. Contractors of Am. v. Metro. Water Dist. of S. Cal.*, 159 F.3d 1178, 1181 (9th Cir. 1998).

"In deciding whether a federal law pre-empts a state [or local] statute, our task is to ascertain Congress'[s] intent in enacting the federal statute at issue." *Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 738 (1985) (quoting *Shaw v.*

---

[5] The district court's contrary decision with respect to the ASPA's ADA claim rested largely on its conclusion that the ASPA's members are not subject to the ADA and, thus, that it could not assert claims that rely on the ADA. A plaintiff's ability to state a claim under a particular statute is not a question of federal subject matter jurisdiction, however, but rather a question of the merits of that claim. *See, e.g.*, *Lexmark*, 134 S. Ct. at 1387 n.4.

*Delta Air Lines, Inc.*, 463 U.S. 85, 95 (1983)). The Supreme Court has emphasized, however, that generally "pre-emption doctrines apply only to state [or local] *regulation*." *Bldg. & Constr. Trades Council of Metro. Dist. v. Associated Builders & Contractors of Mass./R.I., Inc.* (*Boston Harbor*), 507 U.S. 218, 227 (1993). When a state or local government buys services or manages property as a private party would, it acts as a "market participant," not as a regulator, and we presume that its actions are not subject to preemption. *See id.* at 229. Only if a statute evinces an intent to preempt such proprietary actions by a state or local government is the presumption overcome and the action preempted. *See Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 498 F.3d 1031, 1041–42 (9th Cir. 2007).

For the reasons that follow, we hold first that the City was acting as a market participant and not a regulator when it adopted section 25. Second, because nothing in the NLRA, RLA, or ADA shows that Congress meant to preempt states or local governments from actions taken while participating in markets in a non-regulatory capacity, we conclude that section 25 is not preempted by those federal statutes.

## A. The City Is Acting as a Market Participant

To decide whether a state or local government is acting as a market participant or instead as a regulator, we apply the two-prong test first articulated in *Cardinal Towing & Auto Repair, Inc. v. City of Bedford*, 180 F.3d 686 (5th Cir. 1999). *See Johnson v. Rancho Santiago Cmty. Coll. Dist.*, 623 F.3d 1011, 1023 (9th Cir. 2010); *accord, e.g.*, *Engine Mfrs. Ass'n*, 498 F.3d at 1041. First, is the challenged governmental action undertaken in pursuit of the "efficient procurement of needed goods and services," as one might expect of a private business in the same situation? *Johnson*, 623 F.3d at 1023

(quoting *Cardinal Towing*, 180 F.3d at 693).  Second, "does the narrow scope of the challenged action defeat an inference that its primary goal was to encourage a general policy rather than [to] address a specific proprietary problem"?  *Id.* at 1023–24 (quoting *Cardinal Towing*, 180 F.3d at 693).  If the answer to either question is "yes," the governmental entity is acting as a market participant.  *Id.* at 1024.

*Johnson* offers an example of how this test works.  There, a community college district had sold bonds to fund construction projects.  *Id.* at 1016.  As the City did here, the college adopted an agreement governing labor conditions for contractors working on those construction projects that prohibited strikes, picketing, and similar labor disruptions.  *Id.* at 1017.  The agreement also made those unions the exclusive bargaining representatives for workers on the project, required the use of union "hiring halls" for staffing, established mechanisms for resolving disputes, and required the unions to create an apprenticeship program.  *Id.* at 1016–17.

Several non-union apprentices and apprenticeship committees challenged those restrictions as preempted by the NLRA and the Employee Retirement Income Security Act ("ERISA").  *Id.*  We held that the college was acting as a market participant under both prongs of the *Cardinal Towing* test.  *Id.* at 1024–29.  Specifically, we determined that the college had a proprietary interest in the efficient procurement of construction services, including in avoiding labor disruptions.  This was true even though the college may have spent some of its money unwisely, and even though a private actor may not have accepted terms as unfavorable as the college had.  *Id.* at 1025–27.  We also concluded that the scope of the challenged agreement was narrow in that it applied only to construction projects worth

more than $200,000 funded by the bond initiative during a certain time period. *Id.* at 1028–29. Accordingly, we held that the college was acting as a market participant and that the restrictions were not preempted. *See id.* at 1024–29.

Applying that precedent here, we hold that the City satisfies both prongs of the *Cardinal Towing* test and so was acting as a market participant when it added section 25 to the LAX licensing contract.

### 1. Efficient Procurement of Goods and Services

First, like the college in *Johnson*, the City is attempting to avoid disruption of its business: If a private entity operated LAX, that entity would have a pressing interest in avoiding strikes, picket lines, boycotts, and work stoppages. Those interests are not any less pressing simply because the City rather than a private business operates the airport, and labor peace agreements are one way to protect those interests. *See Boston Harbor*, 507 U.S. at 231–32 (holding that Boston's requiring a no-strike provision in subcontractor agreements was permissible market participation because the city was "attempting to ensure an efficient project that would be completed as quickly and effectively as possible" and because "analogous private conduct would be permitted").

Plaintiffs urge the opposite conclusion on the ground that the City has not directly participated in the market and has instead dictated contract terms to others who do. The City does, however, participate directly in a market for goods and services. "[A]irports are commercial establishments . . . [that] must provide services attractive to the marketplace." *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 682 (1992) (citations omitted). If the City operates the airport poorly, fewer passengers will choose to fly into and

out of LAX, fewer airlines will operate from LAX, and the City's business will suffer.  It must avoid commercial pitfalls as the proprietor of a commercial enterprise.

That fact makes this case distinguishable from, for example, *Golden State Transit Corp. v. City of Los Angeles*, 475 U.S. 608 (1986).  In *Golden State*, a plaintiff taxi company alleged that Los Angeles had interfered with labor negotiations by withholding the company's license until a strike against the company ended.  *See id.* at 611–12.  The plaintiff argued that Los Angeles's license decision was preempted by the NLRA, and the Supreme Court agreed.  *Id.* at 615–19.  The Court rejected Los Angeles's argument that its decision was justified by its general interest in ensuring "uninterrupted [citywide taxi] service to the public by prohibiting a strike." *Id.* at 618.  Los Angeles did not operate the taxi service at issue in *Golden State*, nor did it use the taxi company for any city functions or services.  By contrast, here, a department of the City of Los Angeles does operate LAX, and it has taken action to protect its proprietary interest in running the airport smoothly.  *Cf. Boston Harbor*, 507 U.S. at 227 ("[A] very different case would have been presented had the city of Los Angeles purchased taxi services from Golden State in order to transport city employees.").  The City is thus participating in the air transportation market.[6]

---

[6] Plaintiffs relatedly argue that the City is not actually procuring any goods or services but is instead essentially offering licenses, which they describe as a "purely regulatory function."  But a private contracting condition may be proprietary even though it could also be called a licensing scheme. *See, e.g.*, *Johnson*, 623 F.3d at 1017 (holding that the challenged contractual provisions in a project labor agreement were not preempted by the NLRA even though the defendant college district restricted contractors on the project to employing only members of a

To the extent Plaintiffs argue more broadly that the City, as the operator of an airport, is not participating in a *private* market at all, we disagree. At first blush, that argument has some intuitive appeal because most airports in the United States are run by or affiliated with a governmental entity. But the same is not true internationally. *See generally, e.g.*, David L. Bennett, *Airport Privatization After Midway*, 23 Air & Space Law. 22, 22 (2010) (noting the "trend toward private participation in airport ownership and operation in most other parts of the world"); Zane O. Gresham & Brian Busey, *"Do As I Say and Not As I Do"—United States Behind in Airport Privatization*, 17 Air. & Space Law. 12, 13–14 (2002) (describing airport privatization internationally and experimentation with airport privatization in the United States). And, even domestically, Congress has enacted a "pilot program" for privatization of airports. *See* 49 U.S.C. § 47134.

Moreover, the Supreme Court and other federal appellate courts have recognized the inherently competitive and commercial nature of airport operations. *See Int'l Soc'y for Krishna Consciousness*, 505 U.S. at 682; *see also Four T's, Inc. v. Little Rock Mun. Airport Comm'n*, 108 F.3d 909, 912–13 (8th Cir. 1997) (holding, in response to a Commerce Clause challenge, that a city that operated an airport was acting as a participant in the market for airport rental car services). Airports also compete against private modes of transportation, like long-distance travel by train, car, or bus.

particular union, effectively offering a license to only one group). Nor does it matter that the City would not be a party to the contracts that included a labor peace agreement. The challenged municipal action in *Boston Harbor* also involved requiring a no-strike condition in contracts between third parties. 507 U.S. at 220–21. That did not stop the Supreme Court from concluding that Boston was acting as a market participant. *Id.* at 230–32.

*See, e.g.*, Randall O'Toole, Cato Inst., Pol'y Analysis No. 680, Intercity Buses: The Forgotten Mode, (2011), *available at* https://www.cato.org/publications/policy-analysis/intercity-buses-forgotten-mode (noting that intercity buses were "America's fastest growing transportation mode" between 2007 and 2010 (citation and internal quotation marks omitted)).

We therefore conclude that the City is acting as a market participant under the first prong of the *Cardinal Towing* test.

### 2. Narrow Scope

The City's actions independently qualify as market participation under *Cardinal Towing*'s second prong. The decision to adopt section 25 is narrowly tied to a "specific proprietary problem," *Johnson*, 623 F.3d at 1024 (quoting *Cardinal Towing*, 180 F.3d at 693): service disruptions at LAX, which the City manages as proprietor. Nothing in the text of section 25 or in the Complaint's allegations suggests that section 25 will be enforced throughout the rest of the City's jurisdiction or that section 25 will hamper service providers' operations elsewhere.

Plaintiffs argue otherwise, asserting that section 25 is in reality a preempted labor regulation because it gives labor unions a powerful bargaining chip, applies broadly to all service providers at LAX, and governs any organization that requests a labor peace agreement.[7] We find these arguments unpersuasive for reasons that become apparent in considering the three cases Plaintiffs primarily rely upon to

[7] The ASPA also argues that the Service Employees International Union lobbied for section 25, demonstrating a pro-union motivation for its adoption. As discussed *infra* in Part IV, such motive does not matter to the preemption analysis.

support their position. Compared to the regulations imposed in those decisions, section 25 reaches a much narrower swath of commercial activity and focuses on specific proprietary needs.

First, Plaintiffs rely on *Wisconsin Department of Industry, Labor & Human Relations v. Gould Inc.*, 475 U.S. 282 (1986). In that case, the Supreme Court affirmed a decision enjoining a Wisconsin law that barred all state procurement agents from transacting with repeat NLRA violators. *See id.* at 283–84. The Court held that Wisconsin's spending policy swept too broadly to constitute a permissible exercise of market participation, particularly given the lack of an obvious proprietary concern animating the debarment scheme. *Id.* at 289–91. By contrast, section 25 does not govern all of the City's contractual relationships,[8] and the City has a clear proprietary interest in avoiding labor disruptions of airport services.

Second, Plaintiffs cite *Chamber of Commerce of the United States of America v. Brown*, 554 U.S. 60 (2008). There, the Supreme Court analyzed a preemption challenge against a California law that prohibited employers who received state funds from using those funds to "assist, promote, or deter union organizing." *Id.* at 63. The Court held that the law did not represent permissible market participation because it was "neither 'specifically tailored to one particular job' nor a 'legitimate response to state procurement constraints or to local economic needs.'" *Id.* at 70 (quoting *Gould*, 475 U.S. at 291). The law's preamble even explicitly declared that its purpose was to prevent

---

[8] The dissent suggests that section 25 may affect employment relationships outside LAX, but, as discussed further below, Plaintiffs have not alleged any such effects.

employers from supporting or opposing union organization. *Id.* at 62–63. The law also imposed onerous requirements for segregating funds and record keeping, and created a right of action for any private taxpayer to sue suspected violators. *Id.* at 72.[9]  Section 25, by comparison, is limited to addressing the needs of LAX and does not announce any sort of regulatory policy, require complicated recordkeeping, or create litigation risks.

Third, Plaintiffs point to *Metropolitan Milwaukee Association of Commerce v. Milwaukee County* (*Metropolitan Milwaukee II*), 431 F.3d 277 (7th Cir. 2005). That case involved a Milwaukee County ordinance governing businesses the county had hired to provide transportation and other services to elderly and disabled residents. *Id.* at 277–78. Like section 25, the Milwaukee ordinance required those businesses to sign labor peace agreements, but unlike section 25, it imposed several additional conditions favorable to union organizing and did little to avoid service interruptions. *See id.* at 278, 281; *see also Metro. Milwaukee Ass'n of Commerce v. Milwaukee County.* (*Metropolitan Milwaukee I*), 325 F.3d 879, 880–81 (7th Cir. 2003).

The Seventh Circuit held that the ordinance was preempted by the NLRA. *Metropolitan Milwaukee II*, 431 F.3d at 282. It rejected the county's argument that the ordinance was proprietary, in large part because the

___

[9] The dissent suggests that the broad effects the Supreme Court discussed in *Brown* may have been discerned through discovery, but the Supreme Court's analysis focused solely on the text of the challenged law. *See* 554 U.S. at 71–73. The Supreme Court made clear that effects the law would have were obvious on its face. *See Id.* Here, the text of section 25 suggests no obvious overbroad effects, and Plaintiffs have alleged none.

ordinance's impact would not be restricted to contracts with the county. *See id.* at 279–82. For example, the ordinance prohibited contractors from scheduling meetings designed to discourage any of their employees from joining a union, regardless of whether those employees worked on county contracts. *Id.* at 280. The Seventh Circuit also reasoned that the county could have achieved its goal of avoiding service interruptions by other means, *see id.* at 282, and that several of the requirements it imposed focused on union organizing in particular, *see id.* at 278, 280–81; *see also Metropolitan Milwaukee I*, 325 F.3d at 880–81. Here, by contrast, there is no allegation that the purposes of section 25 could be achieved by other means or that the licensing provision will have spillover effects on the service providers' operations beyond their work for LAX. Rather, the nature of the businesses at issue—services performed at LAX—by definition allows for natural divisions between work for the City and work for private parties: A job is either performed at LAX or it is not, and a strike or other disruption either occurs at LAX or it does not.[10]

These arguments are more specific instances of Plaintiffs' broader allegation that section 25 cannot truly be aimed at minimizing service disruptions because it is a poor fit for that job. Under our previous decisions, evidence that an alternative strategy could more effectively or cheaply accomplish the same goals "bears only on whether [a state or local government] made a good business decision, not on

---

[10] We disagree with the dissent that section 25 is written so broadly as to reach the entirety of a given labor organization's membership. In context, it is clear that the provision in question, which refers to "binding and enforceable provision(s) prohibiting the Labor Organization and its members from engaging in" certain disruptive action, is meant to govern service providers at LAX. Section 25 repeatedly refers to operations at LAX, employees at LAX, and the LAX licensing program specifically.

whether it was pursuing regulatory, as opposed to proprietary, goals." *Johnson*, 623 F.3d at 1025. Similarly, we have held that a state or local government may entertain non-economic purposes and yet rely on the market participant doctrine. *See Engine Mfrs. Ass'n*, 498 F.3d at 1046 ("That a state or local governmental entity may have policy goals that it seeks to further through its participation in the market does not preclude the doctrine's application, so long as the action in question is the state's own market participation."). And although, as the dissent points out, the Seventh Circuit decided *Metropolitan Milwaukee II* partially in reliance on an obvious mismatch between the county's asserted purpose and its means of achieving that purpose, the same court later emphasized that lurking political motives are an inevitable part of a public body's actions and are not "a reason for invalidity." *N. Ill. Chapter of Associated Builders & Contractors, Inc. v. Lavin*, 431 F.3d 1004, 1007 (7th Cir. 2005).

This is not to say that a state's supposedly proprietary actions cannot become regulatory if enacted or enforced overbroadly. Preventing such overbreadth is the purpose of the second prong of the *Cardinal Towing* test. *See Johnson*, 623 F.3d at 1023–24. Concerns about overbreadth were largely what led the Supreme Court to strike down the state-wide spending restrictions at issue in *Brown* and *Gould*. *See Brown*, 554 U.S. at 70–71; *Gould*, 475 U.S. at 289–91. But no state-wide restrictions—or, indeed, city-wide restrictions—are even alleged to be at issue here. The City has merely imposed a contract term on those who conduct business at LAX, which the City operates, and that contract term serves a cabined purpose.[11] We therefore conclude that

---

[11] We briefly note our disagreement with two additional arguments Plaintiffs advance. First Plaintiffs (and the dissent) argue that section 25

the second prong of the *Cardinal Towing* test is satisfied, and that, in imposing section 25, the City has acted as a market participant, not as a regulator.

## B. The Presumption Is Not Rebutted by the NLRA, the RLA, or the ADA

Having concluded that the City is acting as a market participant, we must next consider whether there is "any express or implied indication," *Engine Mfrs. Ass'n.*, 498 F.3d at 1042 (quoting *Boston Harbor*, 507 U.S. at 231), that Congress intended the NLRA, the RLA, or the ADA to preempt actions taken by states and local governments in their capacity as market participants. Absent such an indication, the presumption that preemption applies only to regulatory conduct remains in place. *See id.*

We begin with the NLRA. In *Boston Harbor*, the Supreme Court held that the NLRA does not preempt state

---

does not specifically address disruptions by non-union employees. That omission alone does not suggest that the City has advanced a pro-union regulatory policy rather than a proprietary interest. The LAX licensing scheme includes other protections against non-union disruptions. For example, if the airport believes it is necessary to hire police or to take other steps to protect the "efficient operation of LAX" in the event of a violation of section 25 or some other legal or regulatory violation, the service providers may have to reimburse the airport regardless of what or who caused the disruption. Service providers also guarantee the quality of their work, and the City may demand the removal of a service provider's employees or agents.

Second, Plaintiffs argue that section 25 is overbroad because it applies to all operations at LAX. But LAX would hardly avoid service disruptions by requiring labor peace agreements from some service providers and not others. A contract term that applied to fewer than all of the service providers at LAX would risk disruptions attributable to whatever service providers were not required to accept section 25.

or local government actions taken as a market participant. *See* 507 U.S. at 231–32 ("In the absence of any express or implied indication by Congress that a State may not manage its own property when it pursues its purely proprietary interests, and where analogous private conduct would be permitted, this Court will not infer such a restriction."); *see also id.* at 227 ("We have held consistently that the NLRA was intended to supplant state labor regulation, not all legitimate state activity that affects labor.").  Because the City is acting as a market participant here, Plaintiffs have thus not stated a claim for preemption under the NLRA.

We likewise conclude that Plaintiffs have failed to state a claim for preemption under the RLA.  We look to decisions interpreting the NLRA to ascertain the RLA's preemptive extent.  *See Bhd. of R.R. Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 383 (1969); *Air Transp. Ass'n v. City & Cty. of San Francisco*, 266 F.3d 1064, 1075–76 & n.4; *Beers v. S. Pac. Transp. Co.*, 703 F.2d 425, 428 (9th Cir. 1983); *see also, e.g.*, *Hull v. Dutton*, 935 F.2d 1194, 1197–99 (11th Cir. 1991); *McCall v. Chesapeake & Ohio Ry. Co.*, 844 F.2d 294, 301–02 (6th Cir. 1988).  For that reason, relying on the fact that the NLRA does not preempt market participation by state or local governments, we have stated that the RLA likewise does not preempt such conduct.  *See Air Transp. Ass'n*, 266 F.3d at 1076 n.4 (explaining that the "RLA would not preempt actions taken by [a municipal government operating an airport] as a proprietor" (citing *Dillingham Const. N.A., Inc. v. Cty. of Sonoma*, 190 F.3d 1034, 1037 (9th Cir. 1999) (addressing NLRA preemption))).

Finally, we reach the same conclusion about the ADA. Congress enacted the ADA to deregulate "the airline industry through 'maximum reliance on competitive market forces and on actual and potential competition.'" *Northwest,*

*Inc. v. Ginsberg*, 134 S. Ct. 1422, 1428 (2014) (quoting 49 U.S.C. § 40101(a)(6)).  The statute expressly preempts states and their subdivisions from "enact[ing] or enforc[ing] a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier." 49 U.S.C. § 41713(b)(1).

We and the Supreme Court have interpreted the phrases "force and effect of law" or "effect of law" in preemption clauses in other statutes as applying to governmental action that is regulatory in nature and thus as not preempting market participation.  *See, e.g.*, *Am. Trucking Ass'ns v. City of Los Angeles*, 133 S. Ct. 2096, 2102–03 (2013) (interpreting the Federal Aviation Administration Authorization Act of 1994); *Associated Gen. Contractors*, 159 F.3d at 1182–83 (interpreting ERISA).  Under these cases, we conclude that Congress did not intend the ADA to upset proprietary conduct like that at issue here.[12]  *See Am. Trucking Ass'ns*, 133 S. Ct. at 2102.  Plaintiffs therefore have not stated a claim under the ADA.

\*　　\*　　\*

In sum, given the allegations presented in Plaintiffs' Complaint, we conclude that the City was acting as a market participant when it added section 25 to its LAX licensing contract, and that the preemption provisions of the NLRA, the RLA, and the ADA do not apply to state and local

---

[12] Our conclusion is bolstered by the inclusion of an express statutory carve-out in the ADA that preserves the ability of a governmental actor to "carry[] out its proprietary powers and rights." 49 U.S.C. § 41713(b)(3).

governmental actions taken as a market participant.[13]  We therefore affirm the dismissal of Plaintiffs' preemption claims for failure to state a claim on which relief may be granted.

## IV. Leave to Amend

Having concluded that dismissal of the Complaint was appropriate, all that is left for us to consider is whether the district court erred by denying leave to amend.  "Dismissal of a complaint without leave to amend is only proper when, upon de novo review, it is clear that the complaint could not be saved by any amendment." *Ariz. Students' Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858, 871 (9th Cir. 2016).

Here, Plaintiffs argue they must be permitted to amend their Complaint to allege that the City had ulterior motives in adding section 25 to the standard licensing contract. Specifically, Plaintiffs contend they could add allegations that the City wanted to encourage unionization among the service providers' employees.  But when it comes to preemption, "intentions are not what matters." *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 133 S. Ct. 2096, 2103 (2013).  As we have explained, "preemptive scope [does not] turn on state officials' subjective reasons for adopting a regulation or agreement." *Johnson v. Rancho Santiago Cmty. Coll. Dist.*, 623 F.3d 1011, 1026 (9th Cir. 2010). Rather, it is the nature of the government's conduct that makes the difference for our preemption analysis.  *See id.* ("Federal preemption doctrine evaluates what legislation

---

[13] In addition to its preemption arguments, the ASPA argues that section 25 is an unconstitutional condition.  But the ASPA does not explain what constitutional right has been affected.  Nor have Plaintiffs appealed the dismissal of their constitutional claims.

*does*, not why legislators voted for it or what political coalition led to its enactment." (quoting *N. Ill. Chapter of Associated Builders & Contractors, Inc. v. Lavin*, 431 F.3d 1004, 1007 (7th Cir. 2005))).  Amendments along these lines would make no difference to our analysis.

But, for another reason, we conclude that this case was terminated too soon.  We cannot say with a certainty that Plaintiffs could not identify, in an amended complaint, large spillover effects that might substantiate their claim that, in reality, section 25 acts as a regulation.  *See, e.g.*, *Rodriguez v. Steck*, 795 F.3d 1187, 1188 (9th Cir. 2015) (noting that leave to amend should be granted liberally, particularly when defects in the complaint could be cured by supplemental allegations).  If, for example, Plaintiffs could amend their complaint to allege that the City has implemented section 25 in a manner that has imposed wide-ranging and burdensome restrictions on service providers' businesses outside of LAX, that would require a different analysis and could bring this case closer to *Metropolitan Milwaukee Association of Commerce v. Milwaukee County*, 431 F.3d 277, 279 (7th Cir. 2005).  Section 25 went into force more than three years ago, so if there have been such spillover effects, Plaintiffs should be able to allege them in an amended complaint.[14]

---

[14] As explained above, we conclude, contrary to the dissent, that the Complaint does not now include such allegations so does not state a claim for relief on which discovery could be conducted.

## V. Conclusion

The district court's rulings are **AFFIRMED** in part and **VACATED** in part, and the case is **REMANDED** to allow the district court to enter a dismissal with leave to amend.

---

TALLMAN, Circuit Judge, concurring in part and dissenting in part:

I agree with the majority that the ASPA has standing to assert its claims.  The ASPA should also at least be granted leave to amend its Complaint.  But that is where the majority and I part ways.  Even as is, the Complaint states a plausible claim that the City enacted section 25 as a regulatory measure rather than a proprietary one.  At this stage, we must say that this overly broad and facially suspect regulation of labor relations at Los Angeles International Airport ("LAX")—issued by the City's airport commission ostensibly to promote labor peace—contravenes the delicate congressional balancing of national labor relations policy affecting key facilities of interstate commerce.  I respectfully dissent.

## I

### A

It is well established that, in enacting the National Labor Relations Act ("NLRA"), "Congress largely displaced state regulation of industrial relations." *Wis. Dep't of Indus., Labor, & Human Relations v. Gould Inc.*, 475 U.S. 282, 286 (1986).  "The purpose of the [NLRA] was to obtain 'uniform application' of its substantive rules and to avoid the 'diversities and conflicts likely to result from a variety of

local procedures and attitudes toward labor controversies.'" *NLRB v. Nash-Finch Co.*, 404 U.S. 138, 144 (1971) (quoting *Garner v. Teamsters Local Union No. 776*, 346 U.S. 485, 490 (1953)).  To these ends, through the NLRA, Congress erected "a complex and interrelated federal scheme of law, remedy, and administration" and "entrusted administration of the labor policy for the Nation to a centralized administrative agency." *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 242–43 (1959).

Two complementary preemption doctrines serve to preserve uniformity in national labor policy.  The first, *Garmon* preemption, "forbids States to 'regulate activity that the NLRA protects, prohibits, or arguably protects or prohibits.'" *Chamber of Commerce v. Brown*, 554 U.S. 60, 65 (2008) (quoting *Gould*, 475 U.S. at 286).  The second, *Machinists* preemption, "prohibits state and municipal regulation of areas that have been left 'to be controlled by the free play of economic forces.'" *Bldg. & Constr. Trades Council of Metro. Dist. v. Associated Builders & Contractors of Mass./R.I., Inc.* (*Boston Harbor*), 507 U.S. 218, 225 (1993) (quoting *Lodge 76, Int'l Ass'n of Machinists & Aerospace Workers v. Wis. Emp't Relations Comm'n*, 427 U.S. 132, 140 (1976)).  Together, *Garmon* and *Machinists* preempt state and local policies that would otherwise balkanize the "integrated scheme of regulation" and disrupt the balance of power between labor and management embodied in the NLRA.  *Golden State Transit Corp. v. City of Los Angeles* (*Golden State I*), 475 U.S. 608, 613–14 (1986).

Similarly, the Railway Labor Act ("RLA") established a centralized system of labor dispute resolution for the railway and airline industries to promote the free flow of interstate commerce.  *Aircraft Serv. Int'l, Inc. v. Int'l Bhd. of*

*Teamsters, Local 117*, 779 F.3d 1069, 1073 (9th Cir. 2015). *Machinists* and *Garmon* preemption also apply in the RLA context. *Bhd. of R.R. Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 380–81 (1969).

**B**

As the majority correctly notes, a "market participation" exception allows state and local policies to avoid preemption analysis altogether if those policies serve to protect a proprietary interest rather than regulate the labor market. *Boston Harbor*, 507 U.S. at 229–30. But by focusing solely on the market participant exception, the majority glosses over a glaring reality: if the City had no proprietary interest in LAX, section 25 would plainly be preempted by the NLRA.

Section 25 requires service providers to enter into a "labor peace agreement" ("LPA")—a "binding and enforceable" agreement that prohibits affected employees "from engaging in picketing, work stoppages, boycotts, or any other economic interference"—with any labor organization that requests one. If a service provider and requesting labor organization cannot reach a no-strike agreement within sixty days, section 25 requires the parties to submit to binding arbitration. If a service provider refuses to abide by the terms of section 25, the City may revoke its license to do business at the airport.

Section 25 represents precisely the type of local interference in labor-management relations that *Machinists* preemption forbids. In *Golden State I*, the Supreme Court held that while the NLRA "requires an employer and a union to bargain in good faith, . . . it does not require them to reach agreement," nor does it demand a particular outcome from labor negotiations. 475 U.S. at 616; *see also* 29 U.S.C.

§ 158(d) (providing that the duty to bargain in good faith "does not compel either party to agree to a proposal or require the making of a concession"). The substance of labor negotiations, and the results therefrom, are among those areas Congress intentionally left to the free play of economic forces when it legislated in the field of federal labor law. *See Golden State I*, 475 U.S. at 616 (describing the NLRA as providing only "a framework for the negotiations").

The facts of *Golden State I* are instructive—and Los Angeles has been in trouble before for flouting federal labor laws. In that case, the Supreme Court found that *Machinists* preempted the City of Los Angeles' refusal to renew a taxi cab company's license when it failed to reach an agreement with striking union members. *Id.* at 618. By conditioning the renewal of the taxi cab franchise on the acceptance of the union's demands, the City effectively imposed a timeline on the parties' negotiations and undermined the taxi cab company's ability to rely on its own economic power to resist the strike. *Id.* at 615. The Supreme Court held that the City could not pressure the taxi cab company into reaching a settlement and thereby "destroy[] the balance of power designed by Congress, and frustrate[] Congress' decision to leave open the use of economic weapons." *Id.* at 619.

Like the taxi cab company in *Golden State I*, service providers here face a Hobson's choice plausibly inferred from the allegations of the Complaint. If a service provider refuses to negotiate an LPA with a requesting labor organization, it loses its right to do business at LAX. But if the service provider negotiates an LPA, the union knows full well that it can hold out for significant concessions in exchange for its members giving up one of their most valuable economic weapons—the power to go on strike. If the union is unsatisfied with the terms the service provider

offers, the union can request mediation and binding arbitration. Once forced to arbitrate, the tribunal will dictate the result the service provider must accept. The threat of binding arbitration thus seriously limits service providers' ability to rely on their own "economic weapons of self-help" to resist a union's demands.

By forcing unwilling service providers to negotiate and accept LPAs, section 25 compels a result Congress deliberately left to the free play of economic forces. The NLRA does not allow state and local governments to "introduce some standard of properly balanced bargaining power . . . or to define what economic sanctions might be permitted negotiating parties in an ideal or balanced state of collective bargaining." *Golden State I*, 475 U.S. at 619 (alteration in original) (quoting *Machinists*, 427 U.S. at 149–50). Yet that is exactly what section 25 does. In doing so, it directly contravenes federal law.

## II

### A

Whether the City can enforce section 25 thus hinges entirely on the applicability of the market participant exception. The majority is willing to conclude—with little examination of what the full effects of section 25 will be— that the City's proprietary interest in LAX immunizes section 25 from preemption. Supreme Court precedent cautions us against drawing such hasty conclusions, particularly when serious questions persist about whether section 25 advances the City's proprietary interest.

As a preliminary matter, the Supreme Court has made clear that not every government action escapes preemption simply because it touches a proprietary interest. *Gould*,

475 U.S. at 287 (calling "an exercise of the State's spending power rather than its regulatory power. . . . a distinction without a difference").  The animating concern of *Gould*, in the words of Judge Posner, was that "[t]he [state's] spending power may not be used as a *pretext* for regulating labor relations."   *Metro. Milwaukee Ass'n of Commerce v. Milwaukee County* (*Metropolitan Milwaukee II*), 431 F.3d 277, 279 (7th Cir. 2005) (emphasis added).

The fact that the City of Los Angeles owns and operates LAX through its municipal airport commission, and thus has an interest in minimizing disruptions to air travel, cannot alone qualify section 25 for the market participant exception. Instead we must determine, by examining section 25's "actual content and its real effect on federal rights," *Livadas v. Bradshaw*, 512 U.S. 107, 108 (1994), whether section 25's "manifest purpose and inevitable effect" is to do more than protect the City's proprietary interest in running the airport, *see Gould*, 475 U.S. at 291.[1]   Because our inquiry is informed by how section 25 might actually work in practice, it "inevitably is fact-specific," Roger C. Hartley, *Preemption's Market Participant Immunity—A Constitutional Interpretation: Implications for Living Wage and Labor Peace Policies*, 5 U. Pa. J. Lab. & Emp. L. 229, 252 (2003), and deserves more than the surface-level review undertaken by the majority.

---

[1] To be clear, examining a challenged policy's purpose does not involve an investigation into policymakers' "subjective reasons for adopting a regulation or agreement." *Johnson v. Rancho Santiago Cmty. Coll. Dist.*, 623 F.3d 1011, 1026 (9th Cir. 2010); *see also Chamber of Commerce v. Reich*, 74 F.3d 1322, 1336 (D.C. Cir. 1996) (clarifying that it was unnecessary "to question the President's motivation in order to determine whether the [Executive] Order" demonstrated a regulatory purpose).

The Supreme Court's decision in *Chamber of Commerce v. Brown*, 554 U.S. 60 (2008), illustrates the fact-sensitive nature of our analysis.  At issue in *Brown* was California's Assembly Bill 1889 (AB 1889), which prohibited certain private employers from using state funds to "assist, promote, or deter union organizing."  *Id.* at 63 (quoting Cal. Gov't Code §§ 16645.1–16645.7).  The Court found it "beyond dispute that California enacted AB 1889 in its capacity as a regulator rather than a market participant."  *Id.* at 70.  As one obvious example, the preamble to AB 1889 announced an explicit regulatory purpose.  *Id.*

The heart of the Court's market participation analysis, however, focused not on AB 1889's official purpose but on its practical consequences.  Significantly, although AB 1889 purported to affect only state funds, the statute's combination of compliance burdens and litigation risks effectively deterred employers from using *any* funds, state or otherwise, to exercise speech rights protected under the NLRA.  *Id.* at 72–73.  In light of these realities, the Court held that although California had a "legitimate proprietary interest in ensuring that state funds are spent in accordance with the purposes for which they are appropriated," in operation, AB 1889 "effectively reache[d] far beyond the use of funds over which California maintains a sovereign interest."[2]  *Id.* at 70–71.

---

[2] The majority mischaracterizes my analysis of *Brown*.  The critical lesson from *Brown* is that preemption analysis requires a careful inquiry into the actual effects of a challenged policy.  Contrary to the majority's interpretation, the Court's analysis did not focus "solely on the text of AB 1889."  Rather, its ultimate preemption holding rested on how the statute, once operationalized, would affect the real-world choices of entities receiving state funds, and the use of funds over which the state could claim no proprietary interest.  *Id.* at 73 ("AB 1889's enforcement

With respect to section 25, we must be similarly sensitive to the ordinance's real-world impacts.  We must also construe the allegations in the Complaint in the light most favorable to the party resisting dismissal.  *Syed v. M-I, LLC*, 853 F.3d 492, 499 (9th Cir. 2017).  Yet the majority seems content to decide, with little examination of how section 25 might actually operate, that section 25 serves a purely proprietary function.  Applying the *Cardinal Towing* test, the majority makes a conclusory finding that, "like the college in *Johnson*, the City is attempting to avoid disruption of its business."  And with similarly scant analysis, the majority decides that section 25 is "narrowly tied to [the City's] specific proprietary problem."  Distinguishing between government as market participant and government as regulator, however, requires a closer look at section 25's "actual content" and "real effect[s]."  *See Livadas*, 512 U.S. at 108.

## B

Under the first prong of *Cardinal Towing*, we cannot say that section 25 reflects the City's interest in the "efficient procurement of needed goods and services," as we might expect from a private entity.  *Johnson*, 623 F.3d at 1023 (quoting *Cardinal Towing & Auto Repair, Inc. v. City of Bedford*, 180 F.3d 686, 693 (5th Cir. 1999)).  At the risk of stating the obvious, the City here is not directly procuring goods and services to execute a discrete project, but rather providing ongoing licenses permitting a host of service

mechanisms put considerable pressure on an employer either to forgo his 'free speech right to communicate his views to his employees,' or else refuse the receipt of any state funds.  In so doing, the statute . . . chills one side of the 'robust debate which has been protected under the NLRA.'" (citation omitted)).

providers handling baggage, assisting passengers, refueling aircraft, serving food and beverages, and otherwise keeping planes operating on schedule to do business at the airport. The City's proprietary interest here is thus markedly different in kind than that in cases like *Boston Harbor* and *Johnson*, where local governments required project labor agreements that were "specifically tailored to one particular job." *See Boston Harbor*, 507 U.S. at 232.

Furthermore, unlike the project labor agreements in *Boston Harbor* and *Johnson*, there is no evidence that a private operator of LAX would use LPAs as a means of ensuring labor peace. *See Metro. Milwaukee II*, 431 F.3d at 282. Section 8(e)–(f) of the NLRA specifically authorizes the type of project labor agreements at issue in *Boston Harbor* and *Johnson*, indicating that such agreements "are a tried and true remedy for construction stoppages owing to labor disputes." *Id.* at 281–82. Nothing in the record suggests the same is true for LPAs in the private marketplace.

Indeed, if the City's true purpose here is to minimize work stoppages at LAX, section 25 seems an ill-fitted tool for the job. Section 25 is both too narrow and too broad as a means of achieving its purported objective. It is too narrow because, by its own terms, section 25 does not even apply to service providers' employees, but only to the members of a labor organization that requests an LPA. Therefore, if a service provider's employees currently have no recognized collective bargaining representative, those employees will not be covered by an LPA at all. Nor does section 25 apply to other classes of airport workers who may threaten work stoppages. Section 25 also applies only partial deterrence: it penalizes service providers, but not labor organizations, for violating an LPA.

At the same time, section 25 sweeps more broadly than necessary to achieve its goal.  In order for unions to forgo their right to strike, common sense and long experience in labor negotiations tell us we would reasonably expect that service providers will have to make concessions favorable to the unions.  These concessions may be totally unrelated to preventing strikes, and may or may not actually promote labor peace.  Instead of forcing service providers and labor organizations into LPA negotiations, the City could have used other, more targeted mechanisms to prevent labor strife.  In *Metropolitan Milwaukee II*, Judge Posner observed that

> [t]he usual way of dealing with [service interruptions] is to include contract terms that by adding sticks or carrots or both give the provider of the service a compelling incentive to take effective measures to avoid stoppages.  The buyer can offer a premium for timely performance and insist on the inclusion of a stiff liquidated-damages provision as a sanction for untimely performance; there is also, as a further incentive to good performance, the implicit threat of refusing to renew the contract if performance is unsatisfactory.

431 F.3d at 280.[3]  Section 25 is far less straightforward.  To summarize, it only covers a service provider's employees if:

---

[3] The majority distinguishes *Metropolitan Milwaukee II* on the grounds that the county ordinance at issue in that case "did little to avoid service interruptions" and "imposed several additional conditions favorable to union organizing,"  Nothing in the record establishes, however, that section 25 would achieve labor peace any more effectively.  And for reasons explained *infra*, it is reasonable to assume

(1) those employees are already represented by a labor organization; (2) that labor organization requests an LPA; (3) the labor organization and service provider enter into LPA negotiations; and (4) the service provider makes concessions acceptable to the union, which may be totally unrelated to preventing strikes.  If a service provider's employees are not already unionized, once a labor organization secures an LPA, the labor organization must then (5) become the certified bargaining representative of the service provider's employees through NLRB elections. Compared to simple, contract-based incentives, *see id.*, section 25 certainly seems a roundabout way to minimize labor disruptions at LAX.

These tailoring problems suggest that section 25's "manifest purpose and inevitable effect" may not be to protect the City's proprietary interest in the airport at all.[4] *See id.* (holding that tailoring problems may indicate a regulatory purpose); *see also Hotel Emps. & Rest. Emps. Union, Local 57 v. Sage Hosp. Res., LLC*, 390 F.3d 206, 214 (3d Cir. 2004) (noting that "[o]ther appellate courts that have examined the regulator/market-participant distinction also focus on the fit between the challenged state requirement and

that section 25's practical effect is to impose conditions on service providers aimed at facilitating union organizing.

[4] The majority suggests that the poor fit between section 25's actual effects and its purported goals should play no role in our preemption analysis.  But tailoring issues are highly relevant to our evaluation of the first prong of the *Cardinal Towing* test—whether a challenged policy "reflect[s] the [government] entity's interest in its efficient procurement of needed goods and services."  *Johnson*, 623 F.3d at 1023 (quoting *Cardinal Towing*, 180 F.3d at 693).  This inquiry is distinct from examining policymakers' motives, which does not play a role in our analysis, and the narrowness of the challenged policy's scope, which is relevant to *Cardinal Towing* prong two.

the state's proprietary interest in a particular project or transaction" (citing *Chamber of Commerce v. Reich*, 74 F.3d 1322 (D.C. Cir. 1996))).  If section 25 does not directly advance the City's proprietary interest, is it instead a pretext for regulating labor relations?  The complaint plausibly alleges as much.

Historical experience with LPAs, which the majority does not bother to consider, also provides useful insight into whether section 25 reflects a proprietary interest or a regulatory one.  That experience suggests that section 25's true purpose is to alter the balance between labor and management.  In typical LPAs, in exchange for relinquishing their right to strike, unions gain concessions from employers to support unionization of the employer's employees.  *See* Hartley, *supra*, at 246 (summarizing study of over one hundred LPAs).  For example, LPAs often require an employer to remain neutral during union organizing drives. *Id.*  LPAs also often require employers to provide unions with employees' contact information and access to the employer's physical premises to assist with organizing efforts.[5]  *Id.* at 246–47.  A review of LPAs in California similarly found that, in most LPAs, "employers must grant workplace access, provide employee information (names, job titles, contact information, etc.) early in the organizing campaign," "refrain from making disparaging statements

---

[5] Under the NLRA, by contrast, employers may publicly oppose unionization and refuse to give labor organizations access to workplace facilities.  29 U.S.C. § 158(c) (permitting noncoercive employer speech regarding unionization); *Lechmere, Inc. v. NLRB*, 502 U.S. 527, 538 (1992) (upholding general rule that employer may not be compelled to allow nonemployee union organizers onto the employer's property for the distribution of union literature).  Section 25 thus forces service providers to give up statutory rights that would otherwise be protected.

about the union," and/or "require that employers assent to card check recognition and neutrality."[6]  Indeed, in this case, counsel for the City admitted at oral argument that unions would likely seek neutrality from service providers as part of LPA negotiations.  We should therefore be unsurprised that, as the ASPA has alleged, the Service Employees International Union (SEIU) lobbied heavily for section 25 after it tried unsuccessfully to unionize service provider employees at LAX.

Given that LPAs are generally used to promote union organizing, and given counsel's own admission at oral argument, we cannot conclude at this stage that section 25 simply reflects the City's proprietary interest in preventing work stoppages.  Moreover, the City has failed to establish that it enacted section 25 to respond to legitimate concerns about work disruptions at LAX, as we might expect from a private operator of the airport.  The "manifest purpose and inevitable effect" of section 25 thus appears to be aimed at altering the balance of power between service providers and organized labor.  *See Gould*, 475 U.S. at 291.

## C

Turning to the second prong of the *Cardinal Towing* test, we again cannot say conclusively at this stage that section 25's real-world impacts will be sufficiently narrow to qualify for the market participant exception.

Even on cursory facial examination, section 25 does not appear narrowly drawn.  In *Johnson*, we found that the

---

[6] John Logan, Innovations in State and Local Labor Legislation: Neutrality Laws and Labor Peace Agreements in California, in The State of California Labor 2003 157, 184 (Ruth Milkman ed., 2003), available at http://www.iir.ucla.edu/publications/documents/StateofCALabor2003.pdf.

challenged project labor agreement condition in that case was narrow in scope because it was both limited in time and limited to construction projects costing over $200,000. 623 F.3d at 1028.  By contrast, section 25 applies to any service provider at LAX, no matter how big or small the service provider's operations there.  And section 25 is unlimited in duration; service providers must comply with its terms as long as they want to remain licensed to do business at LAX.

The practical effects of section 25 must also inform our determination of whether its scope is narrow.  A challenged policy exceeds a state's proprietary interest if the policy effectively reaches employer conduct "unrelated to the employer's performance of contractual obligations to the state."  *Boston Harbor*, 507 U.S. at 228–29; *see also Brown*, 554 U.S. at 71.  In *Metropolitan Milwaukee II*, for example, the court held that a Milwaukee County ordinance was preempted because it affected government contractors' employees regardless of whether they performed work on government contracts.  431 F.3d at 279.  The ordinance required government contractors to secure LPAs that would apply to the contractors' "employees," without specifying whether "employees" within the meaning of the ordinance was limited to bargaining units that worked on county contracts.  *Id.*  The unrestricted language left open the possibility that an employee who performed only some or no work for the county would be covered by an LPA, even for a labor dispute arising out of non-county work.  *Id.*

Here, we have no assurances—besides the word of the City—that section 25 will have no similar spillover effects. The majority confidently asserts that Section 25 will not "hamper service providers' operations elsewhere."  That conclusion apparently rests on the fact that section 25 as a

whole is aimed at operations at LAX.  But we should be unsurprised that section 25 focuses on LAX, given that the airport authority lacks jurisdiction to *directly* regulate service providers beyond LAX; the City clearly cannot impose contracting conditions on service providers with whom it has no contractual relationship.  The key point, however, is that nothing in section 25 limits *private* agreements between service providers and unions from extending beyond LAX.  Nothing in section 25, for example, dictates that LPAs shall cover only LAX bargaining units. The ordinance provides only that an LPA must apply to a labor organization's "members," regardless of whether they perform only some or none of their work at LAX.  In LPA negotiations, therefore, labor organizations may seek concessions that affect service provider employees well beyond LAX.  And, depending on service providers' business arrangements, it may be impracticable for service providers to segregate their workforces so that only employees who work exclusively at LAX are covered by an LPA.[7]  *See Metro. Milwaukee II*, 431 F.3d at 279–80.

The sheer scale of LAX may also result in spillover effects.  According to the City, "LAX is the fourth busiest passenger airport in the world," and the second busiest in the U.S.  L.A. World Airports, *General*

---

[7] Contrary to the majority's suggestion, we have no indication that any "natural division" between labor performed at and outside LAX exists.  It may be, for example, that some service provider employees perform work both at LAX and at one of the many other regional airports in the greater Los Angeles area.  Should such an employee become involved in a labor dispute, she would be bound by an LPA entered into pursuant to section 25 regardless of whether the dispute arose at LAX or elsewhere.  This type of spillover concern was central in *Metropolitan Milwaukee II*, 431 F.3d at 279–80, and the ASPA should be allowed the opportunity to plead any such facts here.

*Information*, LAX: Los Angeles World Airports, http://www.lawa.org/welcome_lax.aspx?id=40 (last visited July 14, 2017).  Last year, LAX handled over 80.9 million passengers and nearly 700,000 aircraft takeoffs and landings.  *Id.*  In *Reich*, the D.C. Circuit held that an Executive Order affecting all federal contracts over $100,000 served as a regulation, and not market participation, in part because the federal government is such a large purchaser of goods and services.  74 F.3d at 1338.  Here, "given the size of [LAX's] portion of the economy," labor negotiations at LAX may similarly "alter . . . behavior" in the wider market for worldwide airline services.  *See id.*  The ASPA should at least be allowed to plead these potential effects.

## III

If we are to give effect to Congress' intent to "avoid the 'diversities and conflicts likely to result from a variety of local procedures and attitudes toward labor controversies,'" *Nash-Finch Co.*, 404 U.S. at 144, we cannot allow the market participation exception to become too broad.  It is not enough to simply accept state and local governments' assurances that they only seek to enforce labor policies as market participants, particularly when those policies would directly interfere with core rights protected by the NLRA, itself the product of careful congressional balancing of national labor policy in industries affecting interstate commerce.  Even at this early stage of litigation, an inquiry into section 25's "real effect on federal rights," *Livadas*, 512 U.S. at 108, raises serious doubts that the City's interest in enforcing section 25 is merely about protecting its proprietary interest in running Los Angeles International Airport.  At the very least, the majority rightly recognizes that the ASPA is entitled to amend its Complaint.  This case

should also be permitted to proceed to discovery. I respectfully dissent.